UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        :
                                :
                                :
    v.                          :    NO. 3:00CR217(EBB)
                                :
                                :
BEN F. ANDREWS                  :

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL

On October 21, 2003, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, Defendant Ben F. Andrews ("Andrews") orally moved for judgment of acquittal on all counts of the Superseding Indictment ("Indictment") at the close of the Government's case-in-chief at trial.  Tr. Vol. 6 (Excerpt, Remarks of Counsel) at 4.  After a hearing on the oral motion, the Court reserved decision.  Id. at 43.  On October 29, 2003, the jury found Defendant guilty on nine counts of the Indictment. Following the jury's verdict, Defendant orally renewed his motion for judgment of acquittal under Rule 29(a) and orally moved for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.  Tr. Vol. 12 (Excerpt, Remarks of Counsel) at 4.  At that time Defendant requested 30 days to brief his motion for judgment of acquittal and motion for new trial, and the Court granted the request.  Id.  Defendant filed his written memorandum in support of his oral motion for judgment of acquittal on July

7, 2004 [Doc. No. 884]. Defendant filed his written memorandum in support of his oral motion for a new trial on July 9, 2004 [Doc. No. 890]. Defendant filed his Motion to Permit Late Filing of Memoranda in Support of Motions for New Trial and Judgment of Acquittal and supporting memorandum on July 26, 2004 [Doc. No. 891 and Doc. No. 895]. This Court granted the Motion to Permit Late Filing on August 5, 2004. The motion was granted in error, and for the reasons set forth below, this court lacks jurisdiction over Defendant's claims. However, even if this Court had jurisdiction, for the reasons set out below, Defendant's claims are without merit, and would be DENIED.

BACKGROUND

The Indictment

The Indictment alleges that Defendant and others devised a scheme to defraud the citizens of Connecticut of the honest services of the Treasurer, with the purpose of enriching themselves through the improper use of the Treasurer's official position. To accomplish this, the Indictment specifically alleges the following:

Count Three of the Indictment charged Andrews with aiding and abetting Connecticut State Treasurer Paul J. Silvester ("Silvester") to solicit, demand, accept and agree to accept a thing of value, namely a consulting contract for Andrews with

2

Landmark Partners ("Landmark") for $1,000,000, with the intent to influence and reward Silvester in connection with the investment of $100,000,000 of state pension assets with Landmark, all in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2.

Counts Four, Five and Six of the Indictment charged that Andrews devised a scheme or artifice to defraud and deprive the citizens of Connecticut of their right to the Treasurer's honest services, and, for the purpose of executing that scheme, knowingly caused a letter to be sent by a commercial interstate carrier on June 3, 1998, and knowingly caused a facsimile to be transmitted through interstate wires on August 4, 1998 and August 11, 1998, all in violation of 18 U.S.C. §§ 1341, 1343, 1346 and 2. The Indictment specifically alleged that Silvester solicited a consulting contract for Andrews from Landmark at the same time that Silvester used his official position to benefit Landmark by investing $100,000,000 of state pension assets, that Andrews provided support to the "Silvester for State Treasurer" Campaign in circumvention of state laws, and that Andrews agreed that one-half of the corrupt payment from the investment of state pension assets in Landmark be paid to a company wholly owned by Christopher A. Stack ("Stack"), with the knowledge that some of that money would be kicked back to Silvester.

Count Seven of the Indictment charged Andrews with knowingly and corruptly giving, offering and agreeing to give a thing of value, namely money, to Stack and Silvester, with the intent to influence and reward Silvester in connection with a $50,000,000 increase in the investment of state pension assets with Landmark, all in violation of 18 U.S.C. §§ 666(a)(2) and 2.

Counts Eight, Nine and Ten of the Indictment charged that Andrews devised a scheme or artifice to defraud and deprive the citizens of Connecticut of their right to the Treasurer's honest services, and for the purpose of executing that scheme, knowingly caused a letter to be sent by an interstate carrier on December 8, 1998, and knowingly caused a letter to be placed in an authorized mail depository on December 12, 1998 and February 4, 1999, all in violation of 18 U.S.C. §§ 1341, 1346 and 2. The Indictment specifically alleged that Andrews solicited an increase in the State's investment in Landmark before Silvester left office, which resulted in a financial benefit to him (Andrews), with the understanding that one-half of the payment received by Andrews would be paid to a company wholly owned by Stack, and that Stack would kick back a portion of the payment to Silvester.

Count Eleven of the Indictment charged Andrews with conspiracy to money launder, alleging Andrews conducted and

attempted to conduct a financial transaction, knowing that the property involved represented the proceeds of some form of unlawful activity, namely solicitation and receipt of corrupt payments in violation of 18 U.S.C. § 666, receipt of a bribe in violation of Conn. Gen. Stat. § 53a-148, or mail/wire fraud in violation of 18 U.S.C. § 1341 and 1343, and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of that unlawful activity, all in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, the Indictment charged that Andrews agreed that the monies paid to him from the investment of state pension assets with Landmark would be split among himself, Silvester and Stack, and that Andrews understood that the arrangement was a means to make corrupt payments to Silvester.

Count Twelve of the Indictment charged Andrews with knowingly and willfully making a materially false, fictitious and fraudulent statement, in violation of 18 U.S.C. § 1001. Specifically, the Indictment alleged that Andrews told special agents of the Federal Bureau of Investigation ("FBI") and Internal Revenue Service Criminal Investigation Division ("IRS-CID") that he had contacted Stack regarding an investment deal with Landmark, but that he had not discussed a fee-sharing

arrangement with Stack in front of Silvester, when, in truth and in fact, Andrews knew that, after he had offered to kick back a portion of the fees he would earn through the Landmark deal to Silvester, Silvester directed Defendant to take on Stack as a partner and split the fees that resulted from the Landmark investment.

Count Thirteen of the Indictment charged Andrews with witness tampering, by knowingly and corruptly persuading and attempting to persuade witnesses to provide false information to federal law enforcement agents regarding contributions to the "Silvester for State Treasurer" Campaign that were made at his direction, in violation of 18 U.S.C. § 1512(b)(1).

Evidence adduced at trial[1]

The Government's case-in-chief consisted of extensive documentary evidence, as well as testimony from Silvester and Stack. The evidence established that the State of Connecticut received numerous federal grants, including those for transportation, education, and social services. The evidence further established that Silvester was the Connecticut State Treasurer from July 22, 1997 until he left office in January of 1999. During his tenure, he had the final decision-making

---

[1] This section was prepared from the Court's trial notes, and excerpts from the trial transcript, without aid of a full trial transcript, and without aid of any summary of the evidence put forth at trial from either the Defendant or the Government.

authority regarding the allocation of the assets in the Connecticut Retirement Plan and Trust Fund ("CRPTF"). The witnesses and documentary evidence established Andrews's involvement in the scheme to improperly use the Treasurer's official position and to deprive the citizens of Connecticut of the Treasurer's honest services. The evidence showed how Andrews knowingly participated in the scheme to improperly influence Silvester's decisions regarding the allocation of state pension funds and to enrich himself, Stack and Silvester through an elaborate arrangement to pay Andrews a fee for investments with Landmark, with Stack receiving half that fee and kicking it back to Silvester. The evidence also demonstrated Defendant's efforts to conceal this improper use of the Treasurer's position, including kickbacks to Silvester and improper contributions to Silvester's election campaign, and his knowledge about the arrangements for that improper use.

The Jury Verdict

On October 29, 2004, the jury unanimously found Andrews guilty as to Count Three, charging bribery concerning programs receiving federal funding/aiding and abetting under 18 U.S.C. §§ 666(a)(1)(B) and 2; Counts Four and Five, charging mail fraud/theft of honest services under 18 U.S.C. §§ 1341, 1346 and 2; Count Six, charging wire fraud/theft of honest services under

18 U.S.C. §§ 1343, 1346 and 2; Count Seven, charging bribery concerning programs receiving federal funds under 18 U.S.C. §§ 666(a)(2) and 2; Counts Eight and Nine, charging mail fraud/theft of honest services under 18 U.S.C. §§ 1341, 1346 and 2; Count 11, charging conspiracy to launder money in violation of 18 U.S.C. § 1956(h); and Count 12, charging Andrews with making a false statement in violation of 18 U.S.C. § 1001. The jury found Andrews not guilty as to Count Ten, charging mail fraud/theft of honest services under 18 U.S.C. §§ 1341, 1346 and 2, and Count Thirteen, witness tampering, under 18 U.S.C. §1512(b)(1).

LEGAL ANALYSIS

I. Jurisdiction

Federal Rule of Criminal Procedure 29 states in pertinent part, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later, or within any other time the court sets during the 7-day period." FED. R. CRIM. P. 29(c)(1). Federal Rule of Criminal Procedure 33 provides that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty, or within such further time as the court sets during the 7-day period." FED. R. CRIM. P. 33(b)(2). And, Rule 45 (b)(2) of the Federal Rules of

8

Criminal Procedure provides the following:  "The court may not extend the time to take any action under Rules 29, 33, 34, and 35, except as stated in those rules."  FED. R. CRIM. P. 45(b)(2). The Rules are "plain and unambiguous:" District courts have no discretion to entertain untimely Rule 29 motions.  United States v. Carlisle, 517 U.S. 416, 421 (1996).  Furthermore, the time limitations for filing motions for a new trial under Rule 33 are jurisdictional.  United States v. Moreno, 181 F.3d 206, 212 (2d Cir. 1999); United States v. Mayo, 14 F.3d 128, 132 (2d Cir. 1994); United States v. Dukes, 727 F.2d 34, 38 (2d Cir. 1984).

Thus, under both Rule 29 and Rule 33, Defendant had seven days within which to file his motions, or alternatively, within which to request further time to file his motions.  A motion for extension must be granted, if at all, within the seven-day limitation of Rules 29 and 33.

On October 21, 2003, at the close of the Government's evidence at trial, Defendant orally moved for judgment of acquittal on all counts of the Indictment.  This Court reserved decision.  On October 29, 2003, the jury convicted Andrews.  He then had until November 7, 2003 to renew his motion for judgment of acquittal and file a motion for a new trial, or file a motion for extension of time to file his motions.  On October 29, 2003, following the jury verdict, Defendant orally moved for judgment

of acquittal and orally moved for a new trial under Rule 33.[2]  At
that time Defendant requested he be given 30 days to file his
written motion for judgment of acquittal and motion for new
trial, and the Court granted the request.  This Court's order,
therefore, extended the time to file under Rules 29 and 33 until
November 28, 2003.  As Defendant's initial request for an
extension was made within the 7-day limit of both Rules 29 and
33, this initial 30-day extension was proper.  During the seven-
day period following the guilty verdict and discharge of the jury
on October 29, 2003, Defendant did not make any additional
motions requesting an extension of time.  Defendant filed his
written memorandum in support of his motion for judgment of
acquittal on July 7, 2004.  Defendant filed his written
memorandum in support of his motion for a new trial on July 9,
2004.  Defendant filed his Motion to Permit Late Filing of

---

[2] The exchange following the dismissal of the jury was as follows:
MR. DONOVAN:  Judge, I have within ten days to file a motion for judgment of
acquittal or a motion for a new trial.  Could I make those motions right now –
I'm making those motions now – and could Your Honor give me the next 30 days
in which to brief them?
THE COURT:  Does the Government have any objection to that request?
MR. NARDINI:  If I could just have a moment, Your Honor.
(Attorneys Nardini and Ring confer)
MR. NARDINI:  I think – I think as long as Your Honor grants the extension of
time within the ten days, that would be fine.  We have no objection to a 30-
day extension.
MR. DONOVAN:  I guess – I'm – I'm making the motion –
THE COURT:  -- now.  Yes.
MR. DONOVAN:  -- now. Maybe it'll save some time, and it may give me a little
more time to brief.
THE COURT:  Yes.  All right.  You're granted, Mr. Donovan.  Thank you.
MR. DONOVAN:  Thank you, Your Honor.
(Court is adjourned: 5:00 p.m.)
<u>Tr. Vol. 12</u> (Excerpt, Remarks of Counsel, October 29, 2003) at 4-5.

Memoranda in Support of Motions for New Trial and Judgment of Acquittal and supporting memorandum on July 26, 2004, detailing various burdens upon defense counsel. This Court granted the Motion to Permit Late Filing on August 5, 2004. This extension was ineffective because it was granted outside the seven-day limit of both Rule 29 and Rule 33. Thus, irrespective of whatever burdens were upon Defense counsel, this Court had no jurisdiction to entertain any motions filed outside these time limitations. See e.g., Carlisle, 517 U.S. at 421 ("There is simply no room in the text of Rules 29 and 45(b) for the granting of an untimely postverdict motion for judgment of acquittal, regardless of whether the motion is accompanied by a claim of legal innocence, is filed before sentencing, or was filed late because of attorney error."). Id.

Arguably, even if defense counsel's oral motion on October 29, 2003, the sum and substance of which was "I guess I am making the motions now," satisfied the time limitations of Rules 29 and 33, Defendant's motions would still be deemed inadequate because he failed to timely comply with the local rule. See United States v. Yeatts, 639 F.2d 1186, 1188-89 (5ᵗʰ Cir.), cert. denied, 452 U.S. 964 (1981) (holding that, because Defendant "failed to accompany his motion with a memorandum of law citing supporting authorities and allegations of fact relied upon and

required by the local rules of the district court," he effectively abandoned his motion). Id. Local Rule of Civil Procedure 7(a)(1) provides, in pertinent part: "Any motion involving disputed issues of law shall be accompanied by a written memorandum of law and shall indicate in the lower margin of the motion whether oral argument is requested. Failure to submit a memorandum may be deemed sufficient cause to deny the motion." D. CONN. L. CIV. R. 7(a)(1); D. CONN. L. CR. R. 1(c). Defendant requested 30 days within which to brief his oral motions, the Government did not object, and this Court granted his request for extension. However, more than 8 months passed before Defendant filed his supporting memoranda. On July 7, 2004, 252 days after the jury's verdict, Defendant filed his written memorandum in support of his oral motion for judgment of acquittal. Defendant's written memorandum in support of his oral motion for a new trial was filed on July 9, 2004, 254 days after the jury's verdict. And, finally, Defendant filed his Motion to Permit Late Filing of Memoranda in Support of Motions for New Trial and Judgment of Acquittal on July 26, 2004, 271 days after the jury's verdict. Defendant made no substantive argument after the jury verdict, and waited over 8 months to file any substantive argument. Under the plain language of Federal Rules of Criminal Procedure 29 and 33 this court lacks jurisdiction to

hear Defendant's claims.  And under Rule 45(b) this court is explicitly prohibited from granting an extension beyond those permitted in the Rules themselves.  Therefore, this Court has no jurisdiction to entertain Defendant's motions for judgment of acquittal and new trial.  However, if this Court had jurisdiction over Defendant's claims, his motions would be DENIED.

II. Defendant's Motion for Judgment of Acquittal

A. Legal Standard

Rule 29(a) of the Federal Rules of Criminal Procedure provides, in pertinent part, that the Court, on a defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a).  A district court can enter a judgment of acquittal where the evidence is insufficient "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).  See also United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999). When considering a motion for a judgment of acquittal, "the court must be careful to avoid usurping the role of the jury." Id. at

13

129.  The court must give "full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact" in determining whether a reasonable mind might fairly conclude guilt beyond a reasonable doubt was established upon the evidence.  Id.  (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).  A Rule 29 motion does not give the trial court "an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Id. (internal quotations and citation omitted).

The Court "consider[s] the evidence in its totality, not in isolation," United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (internal citation omitted) and "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" Guadagna at 130 (quoting Holland v. United States, 348 U.S. 121, 139 (1954)).  In addition, a jury is entitled to reach its verdict based "entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995) (citations omitted).  A defendant therefore "shoulders a heavy burden" in bringing a challenge to the weight of the evidence supporting a conviction.  Autuori, 212 F.3d at 114 (internal quotations and citation omitted).  With these principles in mind, the Court now turns to the claims in Defendant's Motion for Judgment of

14

Acquittal.

B. 18 U.S.C. § 666 - Counts Three and Seven

In support of his motion for judgment of acquittal, Defendant asserts that the Government failed to put forth sufficient evidence to establish a nexus between Silvester's corrupt activity and federal funding under Counts Three and Seven,[3] and Defendant mounts a facial challenge to 18 U.S.C. § 666 on the ground that section 666 is an unconstitutional exercise of Congress's powers under the Spending Clause. See Memorandum in Support of Ben Andrews's Motion for Judgment of Acquittal ("Defendant's Mem. Acq.") at 4-12.

Title 18 U.S.C. § 666 proscribes, inter alia, bribery of state government officials where the thing of value involved in the bribe is $5,000 or more, and the state government receives federal funds in excess of $10,000 in any one-year period.[4]

---

[3] Defendant argues for a nexus requirement with regard to Counts Four and Seven, see Defendant's Mem. Acq. at 4, but it is apparent Defendant means Counts Three and Seven, as Count Four does not charge Andrews under section 666.

[4] 18 U.S.C. § 666, entitled "Theft or bribery concerning programs receiving Federal funds," provides, in relevant part, that:
(a) Whoever, if the circumstance described in subsection (b) of this section exists--
    (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof-- . . .
    (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $ 5,000 or more; or
    (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $ 5,000 or

15

Defendant's argument, that the Government had to prove a nexus between Silvester's corrupt activity and federal funding, is based on the holdings in <u>United States v. Santopietro</u>, 166 F.3d 88, 93 (2d Cir. 1999); and <u>United States v. Zwick</u>, 199 F.3d 672, 682 n.7 (3d Cir. 1999), which both required proof of a nexus between forbidden conduct and federal funds under 18 U.S.C. § 666. However, these holdings were abrogated by <u>Sabri v. United States</u>, 541 U.S. 600, 124 S. Ct. 1941 (2004). Defendant did not address the holding in <u>Sabri</u> in his memorandum in support of his motion for judgment of acquittal, even though the holding was announced on May 17, 2004, and Defendant did not file his memorandum until July 7, 2004.[5]

---

more;
shall be fined under this title, imprisoned not more than 10 years, or both.
(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $ 10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.
18 U.S.C. § 666.

[5] The Government argues that <u>Sabri</u> is dispositive of these issues in its Reply to Defendant's Motions for Judgment of Acquittal and New Trial [Doc. No. 897]. In his reply, Defendant argues that <u>Sabri</u> is distinguishable from the instant case because <u>Sabri</u> involved a straightforward bribe while here, 1) the situation is "far more complicated," because the giver of the bribe (Landmark) had no idea it was giving a bribe or receiving a benefit as a result of the bribe; and 2) it was unclear here whether the bribe was a) an offer to indirectly pay Silvester; b) the awarding of a consulting contract to Stack; c) Rogers & Wells's hiring of Andrews; or d) contributions to Silvester's campaign. Defendant further argues that <u>Sabri</u> can be distinguished from the instant case because, in <u>Sabri</u>, the Government asserted they could prove a nexus between the Defendant's conduct and the federal funds. Defendant's Reply to Government's Reply to His Motions for Judgment of Acquittal and New Trial ("Defendant's Reply") [Doc. No. 900] at 2-3. These arguments are unavailing. In Count Three, under 18 U.S.C. § 666(a)(1)(B) and 2, the issue was whether Andrews specifically intended and understood that the thing of value, the consulting contract he received with Landmark, was intended to influence Silvester's official action, the investment of $100 million in state pension assets with Landmark. Whether Landmark knew it was giving a bribe is immaterial.

16

In Sabri, the defendant, a real estate developer, was indicted under section 666(a)(2) for offering three separate bribes in connection with a proposed hotel development in the city of Minneapolis.  Like Andrews, Sabri mounted a facial challenge to section 666, arguing that because it does not require evidence of a nexus between the alleged bribes and federal funds paid to the city of Minneapolis and the Minneapolis Community Development Agency, the statute exceeds Congress's reach under Article I, Section 8 of the Constitution.  124 S. Ct. at 1944-46.  Sabri argued that the existence of such a nexus should have been an element of the offense, to be charged in the indictment and proved at trial beyond a reasonable doubt.  Id. The Supreme Court dismissed this argument, holding that, contrary to Andrews's assertions, the Government is not required to demonstrate a nexus between the federal funds and acts charged under 18 U.S.C. § 666, and the Court held that section 666 was a legitimate exercise of Congress's authority under the Spending Clause.  Id. at 1946-47.  As the Court stated in Sabri:

> Congress has authority under the Spending Clause to appropriate federal monies to promote the general welfare, Art. 1, § 8, cl. 1, and it has corresponding authority under the Necessary and Proper Clause, Art. 1, § 8, cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undetermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars.

17

Id. at 1946.

Therefore, when it comes to a legitimate interest under Article I, Congress can do more than simply "sit by" and accept the risk that federal appropriations for the general welfare might be "thwarted by local and state improbity." Id. It can enact laws such as section 666(a)(2), which "addresses the problem at the sources of bribes, by rational means, to safeguard the integrity of the state, local and tribal recipients of federal dollars." Id.

The evidence at trial established that the federal government provides the State of Connecticut with grants, contracts, loans, subsidies, and other forms of financial assistance in excess of $10,000. Additionally, the evidence established that 50,000 Connecticut state employees are paid by federal grants, which include fringe benefits, such as contributions to the CRPTF administered by the Treasurer. As Andrews notes in his brief, the Government did not determine the number of dollars included in the $150 million Landmark investment that had been federal funds earmarked for pension fund contributions. It need not have. Every bribe or kickback cannot be "traceably skimmed from specific federal payments." Id. "Money is fungible, . . . [and] can be drained off here because a federal grant is pouring in there." Id. Here, as in Sabri,

"[i]t is certainly enough that [section 666] condition[s] the offense on a threshold amount of federal dollars defining the federal interest, such as that provided here, and on a bribe that goes well beyond liquor and cigars." Id. at 1946. The evidence was therefore sufficient for a reasonable jury to find that the weight of the evidence went in the Government's favor on Counts Three and Seven, and Defendant's jurisdictional challenge fails. If Defendant's motion were properly before this Court, Defendant's motion for judgment of acquittal on this ground would be DENIED.

C. Constructive Amendment or Prejudicial Variance of the Indictment – Counts 3, 4-6, 7-9

In further support of his motion for judgment of acquittal, Defendant argues that the Indictment was constructively amended, or alternatively, that there was a prejudicial variance between the charges in the Indictment and the proof at trial.

1. Legal Standard

A constructive amendment arises where the terms of an indictment "are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" United States v. Rioux, 97 F.3d

19

648, 661 (2d Cir. 1996) (quoting United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988) (citation omitted)).  Such an amendment is a per se violation of the grand jury clause of the Fifth Amendment.  United States v. Frank, 156 F.3d 332, 338 (2d Cir. 1998).

However, narrowing the scope of an indictment does not constructively amend it.  "Where charges are 'constructively narrowed' or where a generally framed indictment encompasses the specific legal theory or evidence used at trial, no constructive amendment occurs."  United States v. Wallace, 59 F.3d 333, 337 (2d Cir. 1995).  "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime" than that proved at trial.  Id. (quoting United States v. Miller, 471 U.S. 130, 136 (1985)).  Cf. United States v. Jesperson, 65 F.3d 993, 1002 (2d Cir. 1995).

Alternatively, a variance occurs where the terms of the indictment are unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.  United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir. 1994); Wallace, 59 F.3d at 338.  Since "a variance does not

broaden the possible basis for conviction beyond that contained in the indictment, []a defendant must demonstrate substantial prejudice to prevail on a claim of variance."  <u>United States v. LaSpina</u>, 299 F.3d 165, 183 (2d Cir. 2002) (internal quotations and citations omitted).

The evidence at trial, however, "need not, indeed cannot, be a precise replica of the charges contained in an indictment." <u>United States v. Heimann</u>, 705 F.2d 662, 666 (2d Cir. 1983). Provided that a defendant was given notice of the "core of criminality" to be proven at trial, the Second Circuit has "consistently permitted significant flexibility in proof." <u>Jesperson</u>, 65 F.3d at 1001 (citations omitted).

It is well established that a variance is "immaterial – and hence not prejudicial – 'where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'"  <u>Mucciante</u>, 21 F.3d at 1236 (citation and quotations omitted).

2.  Counts Three and Seven

Defendant argues that, with respect to Count Three, the Indictment charged that he aided and abetted Silvester to

21

solicit, demand, accept and agree to accept . . . a consulting contract valued at approximately $1 million," while the Government's theory of the case was that either Silvester obtained monies, Defendant received a contract, Stack received a contract, or that Silvester obtained political contributions.[6] Defendant's Mem. Acq. at 16.  Defendant makes no specific argument with regard to Count Seven.[7]

Andrews was charged under Counts Three and Seven with bribery concerning programs receiving federal funds in violation of Title 18, U.S.C. § 666.  In Count Three, Andrews was charged under §§ 666(a)(1)(B) and 2.  Count Three alleged, in part:

Between in or about April, 1998 and July, 1999, in the District of Connecticut and elsewhere, defendant BEN F. ANDREWS, Christopher Stack and others, known and unknown to the Grand Jury, did aid and abet Paul J. Silvester, knowingly, willfully and corruptly to solicit, demand, accept and agree to accept a thing of value, that is a consulting contract valued at approximately $1 million, intending to be influenced and rewarded

---

[6] Defendant's argument that the Indictment was constructively amended by an alternate theory presented by the Government with respect to the thing of value in Count Three, that Silvester had obtained political contributions, is unavailing here.  The Government did not argue that such a finding would have satisfied an element of section 666, and the Court did not charge the jury that they could find against the Defendant under Count Three if the thing of value had been proven to be political contributions.

[7] Defendant makes an argument with regard to counts seven, eight and nine at page 17 of his motion for acquittal, but this Court believes he means to argue with regard to counts eight and nine, which charged a common mail/wire fraud scheme.

in connection with the business, transaction, and series of transactions of the Connecticut State Treasurer's Office involving a thing of value of $5,000 or more, that is the investment of $100 million of state pension assets with Fund A [Landmark].

This Court's instruction to the jury on the second element of Count Three read in pertinent part, that:

> In Count 3, the Indictment alleges that the thing of value was a consulting contract to the defendant worth $1 million. In order to find this element satisfied for Count 3, you must find beyond a reasonable doubt that Paul Silvester solicited or demanded the $1 million contract for the benefit of any person, including the defendant, Christopher Stack, or Silvester himself, or that Silvester accepted or agreed to accept that contract.[8]

Jury Instructions, United States v. Andrews, 3:00CR217(EBB) at 33.

Count Three charged Andrews with aiding and abetting Silvester's corrupt acceptance of a consulting contract valued at

---

[8] The Court's instruction to the Jury on the second element of Count Three was as follows:
Count 3 – § 666 – Second Element – "A thing of value"
    The second element that the government must prove beyond a reasonable doubt is that Paul Silvester solicited or demanded for the benefit of any person, or accepted or agreed to accept, a thing of value from any person.
    "A thing of value" means any money, property or other thing which Paul Silvester subjectively believed had value.
    In Count 3, the Indictment alleges that the thing of value was a consulting contract to the defendant worth $1 million. In order to find this element satisfied for Count 3, you must find beyond a reasonable doubt that Paul Silvester solicited or demanded the $1 million contract for the benefit of any person, including the defendant, Christopher Stack, or Silvester himself, or that Silvester accepted or agreed to accept that contract.
Jury Instructions, United States v. Andrews, 3:00CR217(EBB) at 33. These excerpts are from the final written charge. No transcript of the charge has been prepared.

approximately $1 million.  The Indictment does not specify the party who benefited from that contract, and it need not, as under the statute, the bribe can be given "for the benefit of any person."  18 U.S.C. § 666(a)(1)(B).  The Government need only have proven, as the jury was charged, that Silvester solicited or demanded the $1 million contract "for the benefit of any person, including the defendant, Christopher Stack, or Silvester himself, or that Silvester accepted or agreed to accept that contract." Silvester testified that he solicited the consulting contract to take care of his friends, Andrews and Stack, and that he "was feathering [his] own nest in the process." <u>Tr. Vol. 5</u> (Excerpt, Testimony of Paul Silvester 10/20/2003) at 123.

This Court's instruction, along with the proof at trial, permissibly narrowed the general language of the Indictment. <u>Wallace</u>, 59 F.3d at 337.  Thus, the Indictment was framed in general terms which encompassed the specific legal theory used at trial, that Silvester corruptly solicited, demanded, accepted and agreed to accept a thing of value, namely, the $1 million consulting contract, and therefore there was no constructive amendment of the Indictment with regard to Count Three.  <u>Id.</u>

In Count Seven, Andrews was charged under 18 U.S.C. §§ 666(a)(2) and 2.  Count Seven alleged, in part:

> Beginning in or about November, 1998 and continuing through in or about July, 1999, in the District of

Connecticut and elsewhere, defendant BEN F. ANDREWS,
Christopher Stack and others, known and unknown to the
Grand Jury, knowingly, willfully and corruptly gave,
offered, and agreed to give a thing of value, that is
money to Christopher A. Stack and Paul J. Silvester,
with the intent to influence and reward an agent of a
State government, Paul J. Silvester, in connection with
the business, transaction or series of transactions of
the Connecticut State Treasurer's Office involving a
thing of value of $5,000 or more, that is a $50 million
increase in the investment of state pension assets with
Fund A [Landmark].

This Court's instruction on Count Seven stated, in part,
that "Count 7 of the indictment alleges that the thing of value
was money to Christopher Stack and Paul Silvester." Jury
Instructions, United States v. Andrews, 3:00CR217(EBB) at 43.
This instruction directly tracks the language of the Indictment,
and testimony at trial from Stack and Silvester corresponds to
the charging language in the Indictment, and thus there was no
constructive amendment with respect to Count Seven.

3. Counts Four through Six

Defendant argues that, with respect to Counts Four through
Six, the Indictment encompassed only three "theories of the thing
of value," while the Government argued a fourth theory:
Defendant's agreement to make Christopher Stack a partner in the
Rogers & Wells consulting contract. Defendant argues that
therefore, "the jury could have found that [he] did not know that
Christopher Stack agreed to provide moneys [sic] to Sylvester
[sic], and that [he] had obtained the Rogers & Wells contract on

25

his own merits, but that the fraudulent payoff was the payment to Sylvester's [sic] friend Stack – a theory not set forth in the indictment."  Defendant's Mem. Acq. at 16-17.

Andrews was charged under Counts Four through Six with a scheme to defraud in violation of Title 18 U.S.C. §§ 1341, 1343, 1346 and 2.[9]  The Indictment alleged, *inter alia*, that:

"[¶3] Beginning in or about April, 1998 and continuing through in or about July, 1999, defendant BEN F. ANDREWS, along with Paul J. Silvester, Christopher Stack and others" devised "a scheme and artifice to defraud and deprive the citizenry of Connecticut of their right to the State Treasurer Paul J.

---

[9] Counts Four through Six charged, in relevant part:
    3.  Beginning in or about April, 1998 and continuing through in or about July, 1999, defendant BEN F. ANDREWS, along with Paul J. Silvester, Christopher Stack and others, known and unknown to the Grand Jury, in the District of Connecticut and elsewhere, devised and intended to devise a scheme and artifice to defraud and deprive the citizenry of Connecticut of their right to the State Treasurer Paul J. Silvester's honest services, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.
    4.  The purpose of the scheme was for defendant BEN F. ANDREWS, together with Paul J. Silvester and Christopher A. Stack, to use the Connecticut State Treasurer's Office to enrich themselves through the improper exercise of Paul J. Silvester's official position and with the intent to deceive the citizenry of Connecticut.
    5.  It was part of the scheme and artifice to defraud that Paul J. Silvester solicited a consulting contract for defendant BEN F. ANDREWS from Fund A [Landmark] while at the same time Paul J. Silvester used his official position to benefit Fund A through the investment of $100 million of state pension assets.
    6.  It was further part of the scheme and artifice to defraud that defendant BEN F. ANDREWS provided financial support to the "Silvester for State Treasurer" Campaign, in circumvention of state laws, when Paul J. Silvester used his official position to the advantage of defendant BEN F. ANDREWS.
    7. It was further part of the scheme and artifice to defraud that defendant BEN F. ANDREWS agreed that one-half of the corrupt payment from the investment of state pension assets with Fund A be paid to KCATS, LLC, a company wholly owned by Christopher A. Stack, with the knowledge that a portion of the money would be kicked back to Paul J. Silvester.

Silvester's honest services"; "[¶5] that Paul J. Silvester solicited a consulting contract for defendant BEN F. ANDREWS from Fund A [Landmark]"; "[¶6] that defendant BEN F. ANDREWS provided financial support to the "Silvester for State Treasurer" Campaign, in circumvention of state laws"; and "[¶7] that defendant BEN F. ANDREWS agreed that one-half of the corrupt payment from the investment of state pension assets with Fund A be paid to KCATS, LLC, a company wholly owned by Christopher A. Stack, with the knowledge that a portion of the money would be kicked back to Paul J. Silvester."

Part of this Court's instructions to the jury on the first element of mail and wire fraud, the existence of a scheme or artifice, under Counts Four through Six and Eight through Ten, referred specifically to Counts Four through Six in part as follows:

> Counts 4, 5, and 6 involve a consulting contract between Defendant and Landmark. Specifically, the Indictment alleges that Silvester solicited a consulting contract for the defendant from Landmark in exchange for a $100 million investment of state pension assets and that defendant knowingly agreed that one-half of the money he received from Landmark would be paid to Stack who would kick back a portion to Silvester. As I have already instructed you, in order to find that the consulting contract constitutes a corrupt payment, you must find that the defendant aided and abetted Paul Silvester in soliciting, demanding, accepting, or agreeing to accept the benefit and that the defendant knew and intended that Silvester was acting with the corrupt intent to be influenced or

rewarded in connection with the investment of state pension funds with Landmark.

This Court also instructed the jury with regard to Counts

Four through Six (and Eight through Ten) as follows:

> In regards to all of these counts, the government must prove that the defendant knew that Silvester had an undisclosed and improper motivation to invest or increase the investment of state pension assets with Landmark, that is, to enrich the defendant, Christopher Stack, or Paul Silvester. The government need not prove that the defendant was aware of all of Silvester's unlawful purposes. The government only needs to prove that the defendant knew of one of these unlawful purposes.

Jury Instructions, <u>United States v. Andrews</u>, 3:00CR217(EBB) at

50-52.

This Court's instructions to the jury required a finding

that Andrews "knew and intended that Silvester was acting with

the corrupt intent to be influenced or rewarded" in connection

with the Landmark investment, and that Andrews "knew that

Silvester had an undisclosed and improper motivation to invest or

increase the investment of state pension assets with Landmark,

that is, to enrich the defendant, Christopher Stack, or Paul

Silvester." <u>Id.</u> And, the Indictment charged that "[t]he purpose

of the scheme and artifice to defraud was for BEN F. ANDREWS,

together with Paul J. Silvester and Christopher A. Stack, to use

the Connecticut State Treasurer's Office to enrich themselves."

<u>See</u> Counts Four through Six, ¶4, Indictment. Thus, contrary to

Defendant's assertions, the jury, given those instructions, could not have found him guilty based upon his receipt of a consulting contract on his own merits which resulted in an innocent and unknowing extension of a benefit to Stack.    Furthermore, Silvester testified that he, Andrews and Stack discussed the Landmark consulting deal at a clam bar the night of the Prescott Bush dinner, and he told Andrews and Stack that he wanted them to work out a way for them both to get paid on the deal.  Tr. Vol. 4 at 148-53.  Silvester also testified that he spoke with Andrews after this initial meeting, and that Andrews told him that Stack was being difficult, and having Stack in the deal would cost Silvester more than it otherwise would.  Tr. Vol. 4 at 157-60.  A reasonable jury could infer that Andrews's role in the deal did not result in an innocent, unknowing benefit to Stack, but rather, that Andrews knew Silvester was acting with the corrupt intent to be influenced or rewarded, and that Silvester had an undisclosed, improper motivation to invest or increase the investment of state pension assets with Landmark.  Because neither the Court's instructions to the jury nor the evidence at trial modified the Indictment with regard to Counts Four through Six, Defendant was not "convicted of an offense other than that charged in the indictment," and therefore, there was no constructive amendment of Counts Four through Six.  Rioux, 97

F.3d at 661.

4.  Counts Eight and Nine

In further support of his motion for judgment of acquittal, Defendant argues that, with respect to Counts Eight and Nine, the Indictment did not set forth the Government's theory that "the corrupt payment was the awarding of the contract to Mr. Andrews himself."  Defendant's Mem. Acq. at 17.[10]

Andrews was charged under Counts Eight through Ten with a scheme and artifice to defraud in violation of Title 18, U.S.C. §§ 1341, 1346 and 2.[11]  The Indictment alleged, *inter alia*: "[¶2]

_____

[10] As stated supra, although Defendant argues that there was a constructive amendment with respect to "counts seven, eight and nine," Defendant seems to mean Counts Eight, Nine and Ten.  Defendant was acquitted on Count Ten, so this Court does not address that count except as encompassed in the charge.
[11] Counts Eight through Ten instructed the jury, in relevant part:
   2.  Beginning in or about November, 1998 and continuing through in or about July, 1999, defendant BEN F. ANDREWS, along with Paul J. Silvester, Christopher Stack and others, known and unknown to the Grand Jury, in the District of Connecticut and elsewhere, devised and intended to devise a scheme and artifice to defraud and deprive the citizenry of Connecticut of their right to the incumbent Connecticut State Treasurer Paul J. Silvester's honest services, performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.
   3.  The purpose of the scheme and artifice to defraud was for BEN F. ANDREWS, together with Paul J. Silvester and Christopher A. Stack, to use the Connecticut State Treasurer's Office to enrich themselves through the improper exercise of Paul J. Silvester's official position and with the intent to deceive the citizenry of Connecticut.
   4.  It was part of the scheme and artifice to defraud that, after Paul J. Silvester's November 3, 1998 defeat for State Treasurer, defendant BEN F. ANDREWS came to Paul J. Silvester and asked him to invest more money in Fund A [Landmark] before Paul J. Silvester left office.
   5.  It was further part of the scheme and artifice to defraud that the increase of state pension assets with Fund A would result in a financial benefit to defendant BEN F. ANDREWS.
   6.  It was further part of the scheme and artifice to defraud that defendant BEN F. ANDREWS agreed that one-half of the payment that he would receive from the increase in the investment of state pension assets with Fund A would be paid to KCATS, LLC, a company wholly owned by Christopher A. Stack, with the understanding that Christopher A. Stack was to kick back a portion of that money to Paul J. Silvester.  As a result of the scheme and artifice to defraud, the citizens of Connecticut were deprived of the honest services of

Beginning in or about November, 1998 and continuing through in or about July, 1999, defendant BEN F. ANDREWS, along with Paul J. Silvester, Christopher Stack and others," "devised and intended to devise a scheme and artifice to defraud and deprive the citizenry of Connecticut of their right to the incumbent Connecticut State Treasurer Paul J. Silvester's honest services"; "[¶3] [t]he purpose of the scheme and artifice to defraud was for BEN F. ANDREWS, together with Paul J. Silvester and Christopher A. Stack, to use the Connecticut State Treasurer's Office to enrich themselves through the improper exercise of Paul J. Silvester's official position"; ""[¶4] after Paul J. Silvester's November 3, 1998 defeat for State Treasurer, defendant BEN F. ANDREWS came to Paul J. Silvester and asked him to invest more money in Fund A [Landmark]"; "[¶5] that the increase of state pension assets with Fund A would result in a financial benefit to defendant BEN F. ANDREWS"; "[¶6] that defendant BEN F. ANDREWS agreed that one-half of the payment that he would receive from the increase in the investment of state pension assets with Fund A would be paid to KCATS, LLC, a company wholly owned by

---

Paul J. Silvester in that Silvester had an undisclosed and improper motivation to increase the state pension assets invested with Fund A, that is to enrich ANDREWS, Christopher A. Stack and himself.

     7.  After reaching an agreement with defendant BEN F. ANDREWS that Christopher A. Stack would be paid because of the increase in the investment of state pension assets with Fund A, and on or about December, 11, 1998, Paul J. Silvester authorized a $50 million increase of state pension assets with Fund A.

Christopher A. Stack, with the understanding that Christopher A. Stack was to kick back a portion of that money to Paul J. Silvester"; and "[¶7] [a]fter reaching an agreement with defendant BEN F. ANDREWS that Christopher A. Stack would be paid because of the increase in the investment of state pension assets with Fund A, and on or about December, 11, 1998, Paul J. Silvester authorized a $50 million increase of state pension assets with Fund A."

This Court's instruction to the jury contained the same language that pertained to Counts Four through Six, and specifically, in regard to Counts Eight through Ten, provided that:

> With respect to the payments charged in Counts 8, 9 and 10, which relate to the $50 million increase of state pension assets with Landmark, you must find that the defendant offered, gave, or agreed to give a benefit knowingly, and with the intent to influence the public official in the performance of his official duties. In other words, that the defendant intended and understood that the benefit was in exchange for an official act to be performed by Silvester.

Jury Instructions, <u>United States v. Andrews</u>, 3:00CR217(EBB) at 51.

Defendant argues that the Government put forth a new theory at trial which constructively amended the Indictment: that the corrupt payment under Counts Eight and Nine was the Landmark consulting contract awarded to Defendant himself. This argument

32

is unpersuasive here, since this theory, that the largesse received by Defendant was one of the means by which Silvester was to receive a benefit, is encompassed in the plain language of Counts Eight through Ten of the Indictment. Paragraph Three states that Defendant, Stack and Silvester sought to "enrich themselves" through the improper exercise of Silvester's official position. Counts Eight through Ten, ¶3, Indictment. Furthermore, the Indictment charged that "the increase of state pension assets" with Landmark "would result in a financial benefit to defendant BEN F. ANDREWS," and that Silvester had an improper motive to increase the state pension funds invested with Landmark, "to enrich ANDREWS, Christopher A. Stack and himself." Counts Eight through Ten, ¶¶ 5 and 6, Indictment.

Defendant's final argument with regard to Counts Three, Four, Five, Six, Eight and Nine is that, even if a constructive amendment did not occur, prejudicial variance did, because "the four different manners in which the jury might find that Sylvester [sic] had received a thing of value are not all set forth in the [Indictment]." Defendant's Mem. Acq. at 17-18. Defendant further argues that the Government's suggestion that "Silvester's corrupt action may have been placing the investment with Smith While [sic]" led to a substantial variance between the

allegations set forth in the Indictment and the proof at trial. Id.

Defendant must demonstrate "substantial prejudice" to prevail on a claim of variance. LaSpina, 299 F.3d at 183. Defendant has offered no proof that the evidence at trial proved facts materially different from those alleged in the Indictment. Mucciante, 21 F.3d at 1236. Furthermore, the Government did not argue, and this Court did not instruct the jury, that the Smith Whiley deal was the corrupt action by Silvester that gave rise to criminal liability.

Defendant was given notice of the "core of criminality" to be proven at trial. Jesperson, 65 F.3d at 1001. Therefore, Defendant's arguments, that the Indictment was constructively amended or that the proof at trial led to a prejudicial variance, are unavailing. If Defendant's motion were properly before this Court, his motion for judgment of acquittal on these grounds would be DENIED.

D. False statement – Count Twelve[12]

Defendant's final argument for judgment of acquittal is that the wording of the Indictment pertaining to the arrangement made with Stack regarding the Landmark deal was vague, and that

---

[12] In Defendant's oral motion for judgment of acquittal, made at the close of the Government's case-in-chief, he moved for acquittal on Count 11, charging him with money laundering. Defendant has not moved for judgment of acquittal on this count in his written motion, so this Court deems the claim abandoned.

Defendant's statement to special agents of the FBI and IRS related to the Landmark deal "was not false and certainly was not willfully so."  Defendant's Mem. Acq. at 22.

The Indictment charged that Andrews "did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, in that defendant BEN F. ANDREWS told special agents of the FBI and of the IRS-CID . . . that he (ANDREWS) had contacted Christopher Stack to become involved in an investment deal by the State of Connecticut with Fund A [Landmark] because he felt that Stack would be helpful in finalizing the deal with the Treasurer, but that he (ANDREWS) had not discussed this arrangement with Stack in front of Paul J. Silvester, when in truth and in fact, as the defendant BEN F. ANDREWS there and then well knew, . . . Paul Silvester directed ANDREWS to take on Christopher Stack as a partner and split the payment resulting from the investment with Fund A." [13]

_____

[13] Count Twelve of the Indictment charged, in pertinent part, as follows:
2.  On or about July 16, 1999, in the District of Connecticut, defendant, BEN F. ANDREWS, in a matter within the jurisdiction of the Federal Bureau of Investigation ("F.B.I.") and the Internal Revenue Service Criminal Investigative Division ("IRS-CID"), both agencies of the executive branch of the Government of the United States, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, in that defendant BEN F. ANDREWS told special agents of the FBI and of the IRS-CID who were then investigating the actions of Paul J. Silvester, the former Treasurer for the State of Connecticut, that he (ANDREWS) had contacted Christopher Stack to become involved in an investment deal by the State of Connecticut with Fund A because he felt that Stack would be helpful in finalizing the deal with the Treasurer, but that he (ANDREWS) had not discussed this arrangement with Stack in front of Paul J. Silvester, when in truth and in fact, as the defendant BEN F. ANDREWS there and then well knew, after defendant BEN F. ANDREWS had offered to kickback to Paul Silvester a portion of the fees that ANDREWS would earn from the investment of state

In his reply to the Government's response to his motions for judgment of acquittal and new trial, Defendant states that "it seems undisputed that [he] never discussed with Sylvester [sic] the precise nature of the arrangements by which Rogers and Wells transmitted one-half of his consulting payments to him, and the other half to Stack."  Defendant Ben Andrews's Reply to Government's Reply to his Motions for Judgment of Acquittal and New Trial [Doc. No. 900] at 4.  After reviewing the testimony, this Court agrees.  Silvester testified that he told Andrews to put Stack into the deal, and he left it to them to work out the "precise nature" of the arrangements.  However, this Court does not agree that Count Twelve required the Government to prove that Silvester and Andrews discussed "the precise nature of the arrangements."  Rather, the Government had only to prove that Andrews had discussed the arrangement to include Stack in the deal in front of Silvester, and then had knowingly and willfully told the special agents of the FBI and IRS-CID that he had not.

In considering Defendant's arguments, this Court "must be careful to avoid usurping the role of the jury." Guadagna, 183 F.3d at 129.  A Rule 29 motion does not give this Court "an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that

---

pension assets with Fund A, Paul Silvester directed ANDREWS to take on Christopher Stack as a partner and split the payment resulting from the investment with Fund A.

of the jury." Id. Agent McTague testified that Andrews told him he had never discussed "his arrangement with Stack for splitting fees" in front of Silvester. Silvester testified that when he discussed the state's $100 million investment in Landmark with Andrews, Andrews inquired as to how Silvester might want his share, and whether or not "[his] boy" in New York should be taken care of. Silvester further testified that he met with Andrews and Stack at the clam bar after the Prescott Bush dinner, and discussed the fee-splitting arrangement. Stack testified that Silvester told Andrews to split the fee in the Landmark deal with Stack at the meeting at the clam bar, and that this was the first time Andrews had discussed the fee-splitting deal with Stack. However, Andrews testified that Silvester did not demand Stack be cut into the Landmark deal at that meeting at the clam bar, and that the only reference he (Andrews) made to Stack with Silvester present was that as the meeting was breaking up, Andrews reminded Stack that they would be meeting the following day. This Court cannot say that a reasonable jury could not have weighed the testimony from Agent McTague, Silvester, Stack and Andrews and concluded that Defendant knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation to the special agents of the FBI and IRS-CID.

Consequently, were Defendant's motion properly before this Court, it would be DENIED as to this ground.

III. Defendant's Motion for New Trial

    A. Legal Standard

    Upon a defendant's motion, a "court may vacate any judgment and grant a new trial if the interest of justice so requires" pursuant to Rule 33 of the Federal Rules of Criminal Procedure. FED. R. CRIM. P. 33(a). A district court has broad discretion to "set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). The Second Circuit has set forth the standard for courts to follow in deciding a Rule 33 motion:

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal citations and quotations omitted).

B. Grants of witness immunity to compel testimony[14]

In support of his motion for a new trial, Defendant asserts that the Court improperly failed to compel the Government to grant statutory immunity to Jerome Wilson and Stanley Alfeld, two potential defense witnesses who both stated their intention to invoke their Fifth Amendment right against self-incrimination if called to testify.

18 U.S.C. §6003(a) gives district courts the power to compel testimony from individuals who would otherwise invoke the privilege against self-incrimination "upon the request of the United States attorney for such district."  An appeal to fairness alone under the Fifth Amendment is unavailing, as "a criminal prosecution, unlike a civil trial, is in no sense a symmetrical proceeding."  United States v. Turkish, 623 F.2d 769, 774 (2d Cir. 1980).  In Turkish, the Second Circuit explained that, while the fairness required by the Fifth Amendment protected defendants against prosecutorial overreaching, it "does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges." Id. at 777.  Rather, the Second Circuit has repeatedly held that the decision to grant immunity is "preeminently a function of the Executive Branch," and only in

---

[14] Defendant's language, reasoning and citations in two paragraphs on page 6 of his brief closely track the language, reasoning and citations in two paragraphs from page 826 of United States v. Bahadar, 954 F.2d 821, 826 (2d Cir. 1995).  Defendant has not cited Bahadar, so the Court assumes it is mere coincidence.

rare instances will a court intervene. United States v. Bahadar, 954 F.2d 821, 825 (2d Cir. 1995) (internal citations and quotations omitted). "[A]bsent extraordinary circumstances, the Due Process Clause imposes no requirement that defense witness immunity be ordered whenever it seems fair to grant it." United States v. Diaz, 176 F.3d 52, 115 (2d Cir. 1999) (quoting Blissett v. Lefevre, 924 F.2d 434, 441 (2d Cir. 1991) (internal citations and quotations omitted). But see United States v. Dolah, 245 F.3d 98, 106 (2d Cir. 2001) ("in some limited circumstances, using the immunity device in a one-sided manner can result in a basic unfairness that rises to the level of a violation of procedural due process.") Id.

The Second Circuit has fashioned a three-part test to gauge whether "extraordinary circumstances" exist:

> To sustain a requirement that use immunity be granted,
> a court must find that: (1) the government has engaged
> in discriminatory use of immunity to gain a tactical
> advantage or through its own overreaching, has forced
> the witness to invoke the Fifth Amendment; and (2) the
> witness' testimony will be material, exculpatory and
> not cumulative and [3] is not obtainable from any other
> source.

United States v. Burns, 684 F.2d 1066, 1077 (2d Cir. 1982). See also Dolah, 245 F.3d at 105 (abrogated on other grounds); Diaz, 176 F.3d at 115; Bahadar, 954 F.2d at 826; Blissett, 924 F.2d at 442; United States v. Pinto, 850 F.2d 927, 935 (2d Cir. 1988). It is the defendant's burden to prove each of these three

elements.    Pinto, 850 F.2d at 935 (citing United States v. Todaro, 744 F.2d 5, 9 (2d Cir. 1984)).

With regard to the first prong of the Burns test, Defendant merely contends that the Government granted statutory immunity to one government witness and granted limited immunity to cooperating defendants through various cooperation, plea and proffer agreements.  Defendant has not shown that these grants of immunity rise to the level of "discriminatory use" of immunity or prosecutorial overreaching sufficient to satisfy the first prong of the Burns test.

Prosecutorial overreaching rises to the level of an "extraordinary circumstance" when it 1) "involve[s] deliberate denial of immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation" or 2) "substantially interferes with the defense, or with a potential defense witness' unfettered choice to testify."  Blissett, 924 F.2d at 442 (internal citations omitted).  "Such interference may involve threats or harassment intended to intimidate and discourage testimony." Id.  Defendant has not shown any deliberate withholding of exculpatory evidence and has put forth no evidence of such interference, and the simple fact that Wilson and Alfeld made representations to the Government that they would invoke their Fifth Amendment privilege

if called to testify is not enough to sustain Defendant's burden on the first prong. Defendant cannot meet his burden by merely showing that the Government granted immunity to their own witnesses while refusing to immunize Wilson and Alfeld. "The number of witnesses immunized by the Government, without more, [does] not support a finding of [prosecutorial] misconduct." Todaro, 744 F.2d at 10.

Furthermore, Defendant has not shown that the testimony of Wilson and Alfeld would have been "material, exculpatory and not cumulative." Undoubtedly, testimony from Wilson and Alfeld related to Andrews's consulting contract with Landmark would be material to the Defendant, but since Wilson and Alfeld hired attorneys and refused comment on any matters related to Andrews, Defendant can only speculate that Wilson and Alfeld would contradict the testimony of Paul Silvester regarding the legitimacy of Andrews's consulting contract with Landmark. Defendant urges this Court to join him in such speculation, by inferring from other evidence presented at trial that the missing testimony of Wilson and Alfeld would be exculpatory. Once potential witnesses assert a Fifth Amendment privilege and defer to their attorneys, it may well be an "insurmountable obstacle" (Defendant's Mem. in Support of New Trial at 8) to require Defendant to show that the missing testimony would have been

42

exculpatory, but nonetheless it is a burden borne by the Defendant in this Circuit.

Defendant has not demonstrated that "extraordinary circumstances" exist to compel this Court to order the Government to grant immunity to Wilson and Alfeld, and therefore, if this Court had jurisdiction over his claims, his motion for a new trial to compel the testimony of Wilson and Alfeld would be DENIED.

C. Impeachment of Defendant

Andrews also argues that a new trial should be granted because the Court failed to properly exercise its discretion under Federal Rule of Evidence 608(b), allowing the Government to conduct "unrestrained impeachment" of him on extraneous matters. Defendant's Mem. in Support of New Trial at 9 - 10. Defendant asserts, as he did during trial, that the Court was required to exercise its discretion by conducting an *in limine* hearing prior to the Government's cross-examination of Defendant on previous instances of misconduct to determine whether, in fact, such instances were probative of truthfulness. Defendant provides no case law to support his position, nor did he at trial. Defendant further asserts that the Government questioned Defendant about particular documents "with such specificity that they might as well have been admitted," in contravention of the prohibition on

43

extrinsic evidence under Rule 608(b). Defendant's Mem. in Support of New Trial at 15.

The scope of cross-examination is limited to "the subject matter of the direct examination and matters affecting the credibility of the witness." FED. R. EVID. 611(b). Furthermore, Rule 608(b) of the Federal Rules of Evidence permits inquiry, at the Court's discretion, into specific instances of conduct of a witness if that conduct is probative of truthfulness or untruthfulness.[15] The Rule expressly prohibits the use of extrinsic evidence to prove specific instances of conduct. Id. As explained in the Advisory Committee Notes to Rule 608(b), although effective cross-examination requires an exploration of a witness' credibility, "the possibilities of abuse are substantial. Consequently safeguards are erected in the form of specific requirements that the instances inquired into be probative of truthfulness or its opposite and not remote in time." FED. R. EVID. 608(b) Adv. Comm. Notes to 1972 Proposed Rules.

"It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the

---

[15] FED. R. EVID. 608(b) provides, in relevant part, that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness... concerning the witness' character for truthfulness or untruthfulness." Id.

government be permitted proper and effective cross-examination in an attempt to elicit the truth." United States v. Havens, 446 U.S. 620, 626-27 (1980). Therefore, if the trial court determines that the cross-examination is probative of truthfulness or untruthfulness, then the questioning should be limited only when the probative value of the cross-examination is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.

Here, Andrews chose to testify. Exercising its discretion under Rule 608(b) and Rule 611, this Court allowed the Government to pursue a line of questioning which explored Defendant's allegedly sworn false statements to impeach his credibility. The impeachment questioning was not "unrestrained." At sidebar, the Government forewarned the defense it would question the Defendant about allegedly false sworn statements, and Defendant admits he had been provided with discovery on all the matters which the Government pursued to attack Defendant's credibility. Defendant's Mem. in Support of New Trial at 11. Furthermore, the Court limited cross-examination to matters within the last ten years. Tr. Vol. 8 at 28. The Government's line of inquiry focused upon the following allegedly false sworn statements:

45

sworn statements related to the Defendant's assets in a bankruptcy application; sworn statements in a bank loan application; and sworn statements related to Defendant's graduation from college and birth date on a form for SEC licensing. Tr. Vol. 7 (Excerpt, Testimony of Ben F. Andrews Afternoon Session 10/22/03) at 85-124; Tr. Vol. 8 at 30-88. Defendant was also cross-examined regarding campaign literature and a job application which gave misleading information about Defendant's status as a college graduate and false information about Defendant's birth date. Tr. Vol. 8 at 63-70. While these statements were not "sworn," they were also probative of untruthfulness. "[U]nless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge." Doyle v. Ohio, 426 U.S. 610, 617 n.7 (1976).

Defendant has not provided support for his assertion that the trial court was required to conduct an *in limine* hearing to determine whether the subject matter of the Government's proposed cross-examination of Defendant would be probative of truthfulness or untruthfulness. Indeed, Defendant's assertion is not supported by the Federal Rules of Evidence, the Advisory Committee Notes to the Federal Rules, or existing case law. The

Advisory Committee Notes to Rule 611 specifically caution that "[t]he ultimate responsibility for the effective working of the adversary system rests with the judge," and therefore, "detailed rules to govern the mode and order of interrogating witnesses and presenting evidence is neither desirable nor feasible." FED. R. EVID. 611 Adv. Comm. Notes to 1972 Proposed Rules. The only support Defendant puts forth for his position is that "refusals to conduct *in limine* hearings are rare, and when they occur, meet with appellate disapproval," citing United States v. Whitmore, 359 F.3d 609, 622 (D.C. Cir. 2004). Defendant's Mem. in Support of New Trial at 13. However, Whitmore is easily distinguishable from this case. In Whitmore, the Court of Appeals held that the trial court had improperly *excluded* cross-examination of the arresting officer regarding prior conduct.[16] Furthermore, in Whitmore, the Court emphasized that "Rule 403 tilts … as do the rules as a whole, toward the admission of evidence in close cases; when performing the balancing test required under Rule 403, . . . the balance should be generally struck in favor of admission." Id. at 619 (internal citations and quotations omitted). In holding that the trial court had erred when it

---

[16] The district court prevented the defendant from cross-examining the arresting officer on 1) the officer's testimony before a judge three years before the events in question; 2) the suspension of the officer's driver's license and failure to report that suspension to his superiors; and 3) the officer's failure to make child support payments. United States v. Whitmore, 359 F.3d 609, 619 (D.C. Cir. 2004).

determined that the officer's alleged false testimony before a judge three years prior to the events in question had little probative value and risked diverting the jury from the facts in the case, the Court noted that "[n]othing could be more probative of a witness' character for untruthfulness than evidence that the witness has previously lied under oath." Id. at 619.

Here, the Government attacked Andrews's credibility through questioning regarding his allegedly false past sworn statements in his bankruptcy filing, bank loan application, and SEC licensing application. This is proper cross-examination under Rule 608(b). In United States v. Jones, the Second Circuit upheld the prosecutor's cross-examination of a defendant about false statements she had made on applications for employment, a loan, membership in the National Association of Securities Dealers, an apartment, a driver's license, and on her income tax returns as probative of truthfulness, and proper under FED. R. EVID. 608(b). 900 F.2d 512, 520-21 (2d Cir. 1990). In rejecting the defendant's appeal of her conviction, the Second Circuit noted that "[t]he oftener a like act has been done, the less probable it is that it could have been done innocently." Id. at 521 (internal citations and quotations omitted). See also United States v. Sperling, 726 F.2d 69, 74-5 (2d Cir. 1984) (holding that cross-examination of defendant regarding his false credit

card applications was proper under FED. R. EVID. 608(b)(1) to show
a lack of credibility); United States v. Clemente, 640 F.2d 1069,
1082-83 (2d Cir. 1981) (holding that cross-examination about
defendant's loan transactions and the destruction of his business
records after receiving a subpoena for their production were
proper under FED. R. EVID. 608(b) and 403); United States v.
Weichert, 783 F.2d 23, 24 (2d Cir. 1986) ("That the [attorney's]
disbarment occurred twelve years before the trial decreased its
probative value but did not require exclusion."); United States
v. Sullivan, 803 F.2d 87, 90-91 (3d Cir. 1986) (holding that
defendant's testimony placed the issue of his credibility before
the jury, and therefore cross-examination of defendant regarding
his fraudulent statements on financial disclosure forms and
federal income tax forms was proper because the alleged acts were
probative of his truthfulness under Rule 608(b)).

    To the extent the Government pursued questioning regarding
false statements made during Andrews's election campaign, those
statements, while not sworn, were probative of truthfulness or
untruthfulness, and therefore proper under Rule 608(b).

    Finally, this Court is satisfied that the Government's use
of documents to refresh Defendant's recollection with regard to
his alleged sworn false statements was not a back door attempt to
prove Andrews's prior conduct through the use of extrinsic

evidence.   The documents were not referred to with any more particularity than necessary to refresh the Defendant's recollection.

Although the impeachment questioning incorporated a number of subjects unrelated to the charges against Defendant, the matters addressed were probative of Defendant's character for truthfulness or untruthfulness, and a defendant who testifies "has no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him." United States v. Payton, 159 F.3d 49, 58 (2d Cir. 1998).  Defendant has not demonstrated that this court has abused its discretion with regard to the impeachment cross-examination of him by the Government, and if this Court had jurisdiction over his claims, his motion for a new trial on this ground would be DENIED.

D. Sixth Amendment Right to Counsel

In further support of his motion for a new trial, Defendant alleges that, during the course of his testimony, the Court issued an order violating Defendant's Sixth Amendment right to counsel, prohibiting defense counsel from conferring with Defendant during an overnight recess which was not rescinded "until after it was too late for counsel practically to consult with the Defendant until the next morning" and prohibiting

defense counsel from consulting with the Defendant about his testimony during brief recesses while Defendant was testifying. Defendant's Mem. in Support of New Trial at 15-16.

The Sixth Amendment provides, in relevant part, that the accused in all criminal prosecutions "shall enjoy the right...to have the Assistance of Counsel for his defense."  U.S. CONST. amend. VI.   In Geders v. United States, the Supreme Court unanimously held that the trial court's order barring a defendant from conferring with his attorney "about anything"[17] during a 17-hour overnight recess between his direct and cross-examination violated this Sixth Amendment guarantee.  425 U.S. 80, 83 (1976). The Court reasoned that there were ways to counter any potential improper "coaching" of the defendant's testimony short of a prohibition on all communication between defendant and his counsel during an overnight recess, but reserved comment on the constitutionality of a ban on communication with counsel during a shorter recess.  Id. at 89-90.

That issue was addressed in Perry v. Leeke, 488 U.S. 272 (1989), where the Court held that a state trial court's order directing the defendant not to talk to anyone, including his

_____

[17] The Supreme Court did not address the significance, if any, of the difference in the trial court's directions to the defendant and to defense counsel.  The trial court told defense counsel "it is better that [the defendant] not talk to you about anything" but told the defendant "Now, Mr. Geders ...I direct you not to discuss *your testimony* in this case with anyone until you are back here tomorrow morning."  Geders v. United States, 425 U.S. 80, 83 (1976) (emphasis added).

lawyer, during a 15-minute court recess following the conclusion of his direct testimony did not implicate the defendant's rights under the Sixth Amendment.  The Court held that though the line between the facts of Geders and the facts of Perry was "thin," it was "a line of constitutional dimension" which "rests on the fact that when a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying."  Perry, 488 U.S. at 281.  The Court distinguished the facts in Perry from Geders on the ground that the normal attorney-client consultation that would occur during an overnight recess would encompass matters that go to the heart of the defense, beyond the defendant's own testimony, while, during a short recess, "there is a virtual certainty that any conversation between the witness and the lawyer would relate to the ongoing testimony" and the trial judge therefore must have the power to maintain the status quo until the defendant is back on the stand.  Id. at 283-84. The Court suggested that, in exercising discretion, a trial judge may alternatively decide to permit consultation between a defendant and his counsel during a short recess while at the same time barring discussion of defendant's ongoing testimony.  Id. at 284 n.8 (citing People v. Stroner, 432 N.E.2d 348, 351 (Ill. App. Ct. 1982) (finding no Sixth Amendment violation where defendant was free to discuss any topic other than his testimony with his

attorney during 30-minute recess between defendant's direct and cross-examination), *aff'd in part and rev'd in part on other grounds*, 449 N.E. 2d 1326 (Ill. 1983)).

_Perry_ also clarified the implication in _Geders_ that a defendant need not show prejudice to establish a violation of the Sixth amendment right to counsel: the constitutional right to counsel is so fundamental that "actual or constructive denial of assistance of counsel altogether is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." _Perry v. Leeke_, 488 U.S. at 280.

The specific facts of this case do not fit neatly into the jurisprudence on this issue. "A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none." _Geders_, 425 U.S. at 86. Andrews's cross-examination began on October 22, 2003. As the Court adjourned for the evening, defense counsel stated his intent to talk with the Defendant about his testimony. _Tr. Vol. 7_ (Excerpt, Testimony of Ben F. Andrews Afternoon Session 10/22/03) at 124-26. The Government requested that the Court bar such consultation, and the Court ordered defense counsel not to talk to his client *about his testimony*, whereupon the Court adjourned for the evening at 5:10 p.m. _Id._ Counsel was not barred from

discussing trial strategy or other germane matters with his client. At approximately 5:30 p.m. defense counsel was informed by the Court that the Government would be researching the propriety of requesting such a ban, and if they found they were in error, they would be requesting a telephone conference with the Court later that evening to seek a rescission of the Court's order. Contact information for a potential conference call was requested and received from defense counsel and the Court.

Later that same evening, between 6:00 p.m. and 7:00 p.m., the Government reached defense counsel for the conference call as he traveled by train, but the connection was poor. Tr. Vol. 8 at 21. At approximately 8:00 p.m., all parties were reached, and the Court presided over a conference call with the Government and defense counsel. During the conference call, the Government asked the Court to rescind the overnight ban as per Geders, and the Court lifted the order barring Andrews from discussing his testimony with defense counsel. Id. at 5. The Court offered to start the next day's proceedings late to afford the Defendant ample time to consult with defense counsel. At that point defense counsel had been barred from speaking with the Defendant *about his testimony* for approximately three hours.

The next morning, October 23, 2003, proceedings were started half an hour late. The Court began by stating on the record the

54

events of the previous evening and offering to take a recess for as long as defense counsel needed to confer with his client. Tr. Vol. 8 at 4-9. Defense counsel requested half an hour to meet with Defendant, and proceedings were recessed from 10:45 a.m. to 11:30 a.m. Id. at 27. The Government requested that under Perry, the Defendant be barred from discussing his testimony with defense counsel during shorter trial recesses. Tr. Vol. 8 at 56.

The Defendant argues that the rescission of the Court's ban on overnight consultation happened too late for defense counsel to "practically consult" with the Defendant, and harmed the Defendant because 1) defense counsel had consumed wine at dinner before the telephone conference; 2) defense counsel took no notes during Defendant's cross-examination because he had the expectation he would discuss the testimony with Defendant immediately after the cross-examination finished, and 3) the Defendant was unavailable after 8:00 p.m. because he was seeking spiritual guidance.

Defendant asserts that the facts of this case are indistinguishable from Jones v. Vacco, 126 F. 3d 408 (2d Cir. 1997), where "the Court of Appeals found that the defendant's right to counsel had been violated by an overnight stay even though the court lifted the stay the next morning." Defendant's Mem. in Support of New Trial, at 15-16. Defendant has misread

Jones.    There,   a  blanket   prohibition   was   issued   during   an
overnight  recess:   the  Court  barred  the  defendant  from  speaking
with  his  attorney  "about  ...anything  because  you  are  in  the
middle  of  cross-examination"  during  the  overnight  break  on  a
Thursday.   Id.  at  411.   The  next  morning,  there  was  a  snowstorm
and  proceedings  were  adjourned  until  the  following  Monday.    The
Court  of  Appeals  found  that  the  Defendant's  right  to  counsel  had
been  violated  because  there  was  no  clear  evidence  in  the  record
that  the  court  actually  lifted  the  ban  the  next  morning,  and
therefore  the  snowstorm  had  "frozen"  defendant's  Sixth  Amendment
right  to  counsel  for  4  days.   Id.  at  416-17.   The  Second  Circuit
specifically  declined  to  decide  whether  lifting  the  ban  the  next
morning  would  have  "cured"  the  violation  of  the  defendant's  right
to  counsel  under  Geders.   Id.  at  417.

The   appropriate   inquiry   is   not   whether   Defendant   was
prejudiced,  but  rather,  whether  he  was  actually  or  constructively
denied  the  assistance  of  counsel  altogether  for  a  period  of  time
that  implicates  his  rights  under  the  Sixth  Amendment.   This  Court
holds  that  he  was  not.   The  facts  of  this  case  are  easily
distinguishable  from  Jones  and  Geders.   Here,  the  Defendant  was
not  denied  the  assistance  of  counsel  overnight;  rather,  the  Court
issued  a  limited  order  to  prevent  improper  influence  on  his
testimony  and  Defendant  was  free  to  discuss  anything  other  than

56

his testimony with counsel.  Furthermore, the narrowly tailored ban was rescinded approximately three hours after it was imposed. In addition, defense counsel was informed at approximately 5:30 p.m., twenty minutes after the ban was imposed, that the Government would conduct research and would be requesting a conference call with the Court later that evening to request that the Court rescind the ban on discussing Andrews's testimony if their research did not support their position.  Presumably defense counsel communicated these events to Defendant.  The Government initially reached defense counsel between 6:00 p.m. and 7:00 p.m. on a poor connection.  All parties were successfully reached at 8:00 p.m. when defense counsel was in a pizza restaurant, consuming wine.  At that point the Court's order was rescinded.  Defense counsel could have avoided the wine that evening, knowing that there was a potential for a conference call with the Court.  Furthermore, the conference call ended shortly after 8:00 p.m.  Defense counsel could have scheduled a time to confer with Defendant even if Defendant was seeking spiritual guidance for part of the evening.  In Perry, the Supreme Court upheld a blanket prohibition which lasted for 15 minutes and, in a footnote favorably cited an Illinois appellate case which held that a ban on the defendant discussing his ongoing testimony with counsel during a 30-minute recess did not

violate the right to counsel where defendant was allowed to discuss other matters. Perry v. Leeke, 488 U.S. at 285 n.8. See also United States v. McLaughlin, 164 F. 3d 1 (D.C. Cir. 1998) (no denial of the right to counsel during fifteen or twenty minute recess where defendant was banned from discussing testimony); Albrecht v. Horn, 314 F. Supp. 2d 451, 476 (E.D.Pa. 2004) (holding that an order barring defendant from consulting with defense counsel during a two-hour recess in the prosecution's cross-examination of defendant was not a violation of defendant's Sixth Amendment right to counsel).

The Court's order to Defendant not to discuss his testimony during an overnight recess, rescinded after approximately three hours, is more analogous to the brief recess and narrowly tailored prohibition in Perry than to the overnight denial of assistance of counsel in Jones and Geders.

Defendant also argues that the Court's continued ban on discussing his testimony with defense counsel during short breaks in his cross-examination violated his Sixth Amendment right to counsel. Such a ban is explicitly permitted by Perry, especially where Defendant has not been barred from discussing other aspects of his defense case.

Given the truth-seeking function of the trial court in the adversarial system, "once the defendant places himself at the

very heart of the trial process, it only comports with basic fairness that the story presented on direct is measured for its accuracy and completeness by uninfluenced testimony on cross-examination." Perry v. Leeke, 488 U.S. at 283 (quoting United States v. DiLapi, 651 F.2d 140, 151 (2d Cir. 1981) (Mishler, J. concurring).  If Defendant's claims were properly before this Court, his motion for a new trial on this ground would be DENIED.

E. Right to Public Trial/Right to be Present

Defendant's final argument for a new trial is that during the course of the trial he complained about hearings that took place outside his presence and the presence of his counsel and the public, particularly *ex parte* conferences with or relating to co-defendant Charles Spadoni ("Spadoni"), and that these hearings violated his right to a public trial under the Sixth Amendment, and his right to be present at all crucial phases of trial under the common law and FED. R. CRIM. P. 43.

1.  Right to a Public Trial

The Sixth Amendment guarantees criminal defendants the right to a public trial. U.S. CONST. amend. VI.  See Duncan v. Louisiana, 391 U.S. 145, 148 (1968) (holding that the Sixth Amendment protections are applicable to the states through the Fourteenth Amendment); In re Oliver, 333 U.S. 257, 266-73 (1948) ("[T]he guarantee [to a public trial] has always been recognized

as a safeguard against any attempt to employ our courts as
instruments of persecution. The knowledge that every criminal
trial is subject to contemporaneous review in the forum of public
opinion is an effective restraint on possible abuse of judicial
power.") Id. at 270. An open trial "enhances both the basic
fairness of the criminal trial and the appearance of fairness so
essential to public confidence in the system." Press-Enterprise
Co. v. Superior Court, 464 U.S. 501, 508 (1984) (citation
omitted). However, the right to a public trial is not absolute,
and will yield where an "overriding interest" is articulated,
"based on findings that closure is essential to preserve higher
values and is narrowly tailored to serve that interest." Id. at
510. "The circumstances under which the press and the public can
be barred from a criminal trial are limited; the State's
justification in denying access must be a weighty one." Id. at
509-10 (citation omitted).

    In Waller v. Georgia, the Supreme Court emphasized the
"rare" circumstances under which the right to an open trial would
give way:

>       [1][T]he party seeking to close the hearing must
>       advance an overriding interest that is likely to be
>       prejudiced, [2] the closure must be no broader than
>       necessary to protect that interest, [3] the trial court
>       must consider reasonable alternatives to closing the
>       proceeding, and [4] it must make findings adequate to
>       support the closure.

467 U.S. 39, 45, 48 (1984).

In the Second Circuit, under the first prong of <u>Waller</u>, the trial judge should "require persuasive evidence of serious risk to an important interest" before ordering any closure. <u>Ayala v. Speckard</u>, 131 F.3d 62, 70 (2d Cir. 1997). Moreover, the degree of closure requested must be proportional to the "gravity of the interest asserted." <u>Id.</u> The greater the closure requested, "the greater must be the gravity of the required interest and the likelihood of risk to that interest." <u>Id.</u> If the extent of the courtroom closure sought is limited, "the burden [the party seeking closure] must carry is not a 'heavy' one." <u>Bowden v. Keane</u>, 237 F.3d 125, 129 (2d Cir. 2001) (citation omitted).

> Whether a closure is deemed broad or narrow depends on a number of factors, including its duration, whether the public can learn (through transcripts for example) what transpired while the trial was closed, whether the evidence presented during the courtroom closure was essential, or whether it was merely cumulative or ancillary, and whether selected members of the public were barred from the courtroom, or whether all spectators were precluded from observing the proceedings.

<u>Bowden v. Keane</u> at 129-30 (internal citations omitted).

Once persuasive evidence has been put forth in the interest of closure, the trial judge satisfies the second <u>Waller</u> factor by limiting the closure to those portions of the proceedings that "jeopardize[] the interests advanced." <u>Waller</u>, 467 U.S. at 48-49.

The Second Circuit has held that <u>Waller</u>'s third prong is satisfied where the court has ordered "limited closure...as an alternative to complete closure;" a trial judge need not "*sua sponte* consider further alternatives." <u>Ayala</u>, 131 F.3d at 71.

Additionally, the press and the public enjoy a qualified right of access to criminal trials, "implicit in the guarantees of the First Amendment," and applied to the states through the Fourteenth Amendment. <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555, 580 (1980). <u>See also</u> <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 603-06 (1982).[18]

Traditionally, when a question arises regarding claims of privilege pertaining to documents, the documents are submitted to the trial judge for *in camera* review. <u>See</u>, e.g., <u>In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002</u>, 318 F.3d 379, 386-87 (2d Cir. 2003); <u>United States v. Wolfson</u>, 55 F.3d 58, 60 (2d Cir. 1995). Where a closed proceeding is ordered because the moving party seeks to prevent access to a portion of the proceedings regarding a privileged document, the right of access depends on: 1) "whether there has been a 'tradition of accessibility' to that stage or those documents," and 2) "whether that traditional public access 'plays a particularly significant

---

[18] Defendant's motion argues only for *his* right to a public trial; that the public was not present at conferences regarding Mr. Spadoni is mentioned only in passing in Defendant's brief. Defendant has not made an argument regarding the public's First Amendment right of access, therefore this Court will not address that issue.

positive role in the actual functioning of the process.'" _Wolfson_, 55 F.3d at 60 (quoting _Press-Enterprise Co. v. Superior Court_, 478 U.S. 1, 10-11 (1986) (Press-Enterprise II)). The public has no right of access to a document to which the defendant himself has no right of access. _Id._

Even if closure is found to be unjustified, in certain circumstances it will not violate a defendant's Sixth Amendment rights. Where the closure is trivial and inadvertent, the Second Circuit has held there is no violation of the Sixth Amendment right to a public trial. _Peterson v. Williams_, 85 F.3d 39, 40 (2d Cir. 1996). _See also_ _Brown v. Kuhlmann_, 142 F.3d 529, 534, 536 (2d Cir. 1998). And, even where a proceeding is ordered closed for a substantial period, the closure will not necessarily violate the defendant's Sixth Amendment rights. _See_, _e.g._, _Gonzalez v. Quinones_, 211 F.3d 735, 736-38 (2d Cir. 2000) (holding that non-trivial closure would be permitted if justified by the circumstances, and remanding case for hearing on whether circumstances would have justified closure where court officer failed to follow procedure and locked courtroom doors, unbeknownst to the trial judge, during the testimony of two undercover officers); _Bobb v. Senkowski_, 196 F.3d 350, 353-54 (2d Cir. 1999) (holding Sixth Amendment was not violated where courtroom was closed during testimony of undercover officer who

63

continued to work undercover, had yet to apprehend several investigation suspects, and feared for his safety if he were to testify publicly); Brown, 142 F.3d at 538 (holding that the Waller test was satisfied where courtroom closure during undercover officer's testimony was brief, the testimony given was merely corroborative, and the transcript of the closed proceeding was available to the public).

If a closed proceeding is found to violate a defendant's Sixth Amendment right to a public trial, Waller instructs that "the remedy should be appropriate to the violation," and would not necessarily entail a new trial, lest the Defendant receive a "windfall." Waller, 467 U.S. at 50.

2.  Right to Be Present

It is well settled that a criminal defendant enjoys the right both at common law and under the Confrontation Clause of the Sixth Amendment to be present at criminal proceedings against him. United States v. Jones, 381 F.3d 114, 121 (2d Cir. 2004) (citing United States v. Gagnon, 470 U.S. 522, 526 (1985)). Indeed, "'[a] leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner.'" United States v. Canady, 126 F.3d 352, 360 (2d Cir. 1997) (quoting Lewis v. United States, 146 U.S. 370, 372 (1892)). This right of presence at all

stages of trial "is 'scarcely less important to the accused than
the right of trial itself.'" Id. (citing Diaz v. United States,
223 U.S. 442, 456 (1912)).

Where a defendant is not directly confronting a witness or
evidence against him, he has a due process right, grounded in the
Fifth and Fourteenth Amendments, to be present "whenever his
presence has a relation, reasonably substantial, to the fulness
of his opportunity to defend against the charge." Kentucky v.
Stincer, 482 U.S. 730, 745 (1987) (quoting Snyder v.
Massachusetts, 291 U.S. 97, 105-06 (1934)); Gagnon, 470 U.S. at
526. Due process requires that the Defendant be present "to the
extent that a fair and just hearing would be thwarted by his
absence, and to that extent only." Snyder, 291 U.S. at 107-08.
The Due Process Clause does not grant the privilege "when
presence would be useless, or the benefit but a shadow." Id. at
106-07. Rather, "the justice or injustice of [a particular]
exclusion must be determined in the light of the whole record."
Snyder, 291 U.S. at 115.

This due process and common law right to be present has been
codified in Rule 43 of the Federal Rules of Criminal Procedure,
which mandates that "the defendant must be present at . . . the
initial appearance, the initial arraignment, and the plea; . . .
at every trial stage, including jury impanelment and the return

of the verdict; and . . . sentencing[,]" except as otherwise provided by the Rule or Rule 5 or 10. Fed. R. Crim. P. 43(a). A defendant need not be present for a proceeding that "involves only a conference or hearing on a question of law." Fed. R. Crim. P. 43(b)(3).

A criminal defendant may waive the right to be present. United States v. Fontanez, 878 F.2d 33, 35 (2d Cir. 1989). The waiver may be express, or, if the Defendant fails to appear at trial or during a portion of the proceedings, implied by conduct. Clark v. Stinson, 214 F.3d 315, 323 (2d Cir. 2000). The waiver must be voluntary and knowing. Fontanez, 878 F.2d at 36 (citation omitted). The Second Circuit has held that "only minimal knowledge on the part of the accused is required when waiver is implied from conduct." Cohen v. Senkowski, 290 F.3d 485, 491 (2d Cir. 2002) (citations omitted). Where a defendant is voluntarily absent from a portion of the proceedings, failure to assert his right to be present at the time the decision is made to proceed without him can constitute a waiver. Gagnon, 470 U.S. at 528-29 (holding a defendant need not be expressly warned of his rights under Rule 43 where a defendant knew of a trial conference with a juror and did not assert his right to be present). See also Fed. R. Crim. P. 43(c) (a defendant who was initially present waives the right to be present "when the

defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial").

If it is determined that the exclusion of the defendant from a portion of the trial proceedings was in error, that exclusion is not "ipso facto a structural defect." United States v. Feliciano, 223 F.3d 102, 111 (2d Cir. 2000). The "nature of a 'presence error'" must be considered "in the context of the specific proceeding from which the defendant was excluded." Id. at 111-12 (quoting Yarborough v. Keane, 101 F.3d 894, 898 (2d Cir. 1996)). A structural error requiring automatic reversal will only be found where a defendant's absence "so fundamentally undermines the fairness or the validity of the trial" that the result must be voided "regardless of identifiable prejudice." Yarborough, 101 F.3d at 897 (citing Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991)).

3. Discussion

It appears that Defendant's allegations in his Motion for a New Trial regarding hearings that took place outside the presence of himself, his counsel and the public relate to the Government's sealed motion *in limine* [Doc. No. 762] requesting an *ex parte*, *in camera* inspection of a document used by co-defendant Spadoni to refresh his recollection before meeting with the Government to

discuss potential cooperation in the Government case against Mr. Andrews, and the resulting *ex parte, in camera* inspection of that document and *in camera* proceeding in chambers among the potential privilege holders.[19]  In its motion *in limine*, the Government asserted that it intended to call Spadoni as a witness, and that it was informed by Spadoni's counsel that a document he used to refresh his recollection may have been obtained under a joint defense agreement.  The Government's motion *in limine* set out its concern that a situation could arise where Spadoni would testify at trial, based on a recollection refreshed from the document in question, the defense then would move under FED. R. EVID. 612 for the production of the document in question, and production would be denied, based on a privilege asserted by a third party.  A denial of disclosure to the defense, based on privilege, potentially risked either the striking of Spadoni's testimony or a mistrial under FED. R. EVID. 612.  A sidebar conference was held to address the Government's

---

[19] Defendant has not identified the specific proceedings from which he claims he, his counsel, or the public was excluded.  The Government believes Defendant is referring to two proceedings related to potential cooperation by co-defendant Charles Spadoni and the use of a potentially privileged document to refresh his recollection.  Upon the Court's order, the Government filed a Supplemental Response on this issue in November of 2004.  The Defendant has not filed a supplemental reply.  Therefore, the Court will assume that the proceedings occurring on October 15 and 16, 2003 are the only proceedings Defendant had in mind when moving for a new trial, and the right to a public trial and Defendant's right to be present shall be addressed only with regard to those proceedings.

motion *in limine* and an *in camera* inspection was scheduled for the following morning.

a.  Sidebar Conference October 15, 2003

The sidebar conference addressing the Government's motion *in limine* was held on October 15, 2003, attended by the Court, counsel for Defendant, and the Government.  Tr. Vol. 2 (Excerpt, Sidebar Conf. at 3).  The jury was excused for the evening shortly after 5:00 p.m. and the sidebar commenced.  It ended at 5:17 p.m., and is transcribed in approximately 15 pages of text. Id. at 3-17.  As Defendant's motion has not identified the sidebar as a specific proceeding from which he was excluded, to the extent the sidebar presaged the *ex parte*, *in camera* inspection, and the resulting *in camera* proceeding among the potential privilege holders, it is addressed here.

(1) The Sidebar and the Right to a Public Trial

Defendant has not shown how the brief sidebar violated his right to a public trial.  The sidebar was less than 17 minutes in duration and was justified by the circumstances.  The Government requested the sidebar to discuss scheduling matters regarding the filing of the Government's sealed motion requesting an *ex parte*, *in camera* inspection of a potentially privileged document used by cooperating witness Charles Spadoni.  Defendant has not shown how this was anything other than "trivial."  Peterson, 85 F.3d at 42

69

(holding closure too trivial to violate Sixth Amendment where courtroom closed inadvertently for fifteen or twenty minutes during Defendant's testimony); <u>Brown</u>, 142 F.3d at 534 (holding that closure did not violate Defendant's right to a public trial where the testimony given during closure regarded a collateral issue).

(2) Presence of Defendant at the Sidebar

There is no indication in the record that Defendant was present at the sidebar conference, yet there is no objection in the record regarding Defendant's absence from the sidebar. The only defense objection in the record is in regard to the use of the sidebar to discuss the Government's motion *in limine*. <u>Tr. Vol. 2</u> (Excerpt, Sidebar Conf.) at 4, 6. To the extent this brief sidebar was included in Defendant's allegations that his right to be present at all crucial phases of the proceedings was violated, Defendant implicitly waived his right by failing to assert it at the time of the sidebar. See <u>Gagnon</u>, 470 U.S. at 529 ("[R]espondents' total failure to assert their rights to attend the conference with the juror sufficed to waive their rights under <u>Rule 43</u>"); Fed. R. Crim. P. 43(c); <u>Clark</u>, 214 F.3d at 323-25.

Furthermore, the sidebar merely addressed legal questions regarding the Government's motion *in limine*, and a defendant need

not be present where a proceeding involves only a question of law. FED. R. CRIM. P. 43(b)(3). See also United States v. Rivera, 22 F.3d 430 (2d Cir. 1994) (holding that a conference regarding jury instructions is a conference on a question of law and Defendant need not be present).

And finally, Defendant has not given any indication that his presence at the sidebar would have had a "substantial relationship" to his opportunity to defend himself at trial, especially where his counsel was present, representing his interests. Stincer, 482 U.S. at 746. "[T]here is no indication that respondent 'could have done [anything] had [he] been at the [hearing] nor would [he] have gained anything by attending.'" Id. at 747 (quoting Gagnon, 470 U.S. at 527 (alterations in original)).

b.  October 16, 2003 *In Camera* Proceedings

On the morning of October 16, 2003, the Court held an *ex parte*, *in camera* hearing with Spadoni, his counsel, and the apparent author of the potentially privileged document in Spadoni's possession, Attorney Miner, where the court reviewed the document. Tr. Jury Trial Conf. in Chambers 10/16/03 at 3 - 4.  Neither the Government nor Defendant or his counsel was present when the Court reviewed the potentially privileged document.  Following the document inspection, the Court held an

71

*in camera* proceeding with potential privilege holders regarding the document in Spadoni's possession. In attendance at that conference were counsel for the Government, counsel for Defendant, Defendant Andrews, counsel for co-defendant Spadoni, and co-defendant Spadoni. Counsel for co-defendant Triumph Capital participated by telephone, as did Counsel for co-Defendant Frederick McCarthy. At this proceeding, the discussion centered upon whether any of the parties asserted a privilege regarding the document used by Spadoni to refresh his recollection, and whether it would present a problem if, during the trial, Defendant sought production of the document under FED. R. EVID. 612. Counsel for co-defendant Triumph Capital and co-defendant McCarthy claimed a privilege regarding the document in Spadoni's possession. Id. at 19-20, 30, 31. However, during the *in camera* proceeding, Defendant and his counsel disclaimed any right he had under FED. R. EVID. 612 to seek the document during a potential cross-examination of Spadoni, were he to testify.[20] Id. at 6, 27-28. The Court therefore having reviewed the document *in camera* to consider the potential privilege issues left the matter regarding privilege assertions for a future hearing should the need have arisen. Id. at 32-35.

---

[20] In fact, Spadoni was never called to testify at the trial.

(1) The *In Camera* Conference and the Right to a Public Trial

To the extent Defendant includes the *ex parte*, *in camera* inspection of the document in Spadoni's possession among those conferences with or relating to co-defendant Spadoni from which he was excluded, his argument is without merit. Such *in camera* proceedings are routinely used to "resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights" and competing claims of privilege, here based on attorney-client and attorney work-product privilege. In Re Grand Jury Subpoenas Directing Edward Taylor to Appear and Testify Before a Grand Jury on July 20, 1977 at 10:00 a.m., 567 F.2d 1183, 1188 (2d Cir. 1977). See also Wolfson, 55 F.3d at 60 ("disputed materials are properly submitted only to the trial court for *in camera* review") (citation and quotations omitted). Furthermore, the closure of the *ex parte* inspection of the potentially privileged document was intended to keep intact the potential privileges asserted in regard to the document in question. There was a serious risk that the potential privilege could have been eroded if the proceedings were conducted in public. The *ex parte*, *in camera* inspection was limited in duration, ancillary to the issues at trial, and the Court summarized the meeting at the beginning of the *in camera* proceedings which followed the actual inspection. Bowden, 237

73

F.3d at 129-30.   Finally, there is no "tradition of accessibility" to privileged documents or to related proceedings, and the public has no right of access to a document to which the Defendant has been denied access under a claim of privilege.   See Wolfson, 55 F.3d at 60.

The *in camera* proceeding with the potential privilege holders, the defense, and the prosecution that followed the *ex parte* inspection of the document centered upon the potential assertions of attorney-client and work-product privilege, the need for eventual disclosure, and the discoverability of the document in Spadoni's possession.   In weighing the decision to hold a closed proceeding, this Court determined that the Government's motion *in limine* provided "persuasive evidence of a serious risk" to any potential privilege regarding the document in question and to the confidentiality regarding the potential cooperation of co-Defendant Spadoni.   See Ayala, 131 F.3d at 70. Open proceedings regarding the document reviewed by Spadoni could have compromised the privileges related to the document and would have eroded the confidentiality regarding Spadoni's potential cooperation.   Furthermore, the closure was limited solely to a discussion of the privilege assertions by various third parties and the proceeding included all potential privilege holders, counsel for the Government, Andrews and his counsel.   Tr. Jury

Trial Conf. in Chambers 10/16/03 at 3, 35. The *in camera* proceeding was brief, lasting no more than 29 minutes, no evidence was presented, and only the general public was excluded. Bowden, 237 F.3d at 129-30. See Gonzalez, 211 F.3d at 736 (holding that circumstances can justify a non-trivial, temporary closure, even for important proceedings). Thus the closure was "no broader than necessary" to protect the confidentiality of both the document in question and the potential cooperation of co-defendant Spadoni. Waller, 467 U.S. at 48. Once this Court determined that limited closure was appropriate, there was no need to consider any additional alternatives to full closure. Ayala, 131 F.3d at 71.

(2) Presence of Defendant at the *In Camera* Conference

Furthermore, the Defendant and his counsel were present at the *in camera* proceeding following the *ex parte*, *in camera* inspection of the potentially privileged document. Tr. Jury Trial Conf. in Chambers 10/16/03 at 3, 6. To the extent Defendant argues his right to be present was violated earlier that same morning at the *ex parte, in camera* document inspection, he has not shown how a "fair and just hearing [was] thwarted by his absence." Snyder, 291 U.S. at 108. In light of the "whole record," as Defendant later disclaimed any right to the document, it appears that his presence at the *ex parte*, *in camera*

inspection would have been "useless." Id. at 115, 106.

    4. Conclusion

    With regard to his public trial claim, Defendant has failed
to show that the exclusion of the public from either the *in
camera* proceeding or from the brief sidebar violated his rights
under the Sixth Amendment and warrants a new trial. The limited
closure meets the strictures of the Waller test, and as the
Second Circuit has stated, a court "should proceed with some
caution before ordering such disproportionate relief in a case
[such as this, where] the trial judge did not 'deliberately
enforce[] secrecy in order to be free of the safeguards of the
public's scrutiny,'" and, as the issues discussed were ancillary
to the issues at trial, where "the error is not of 'the sort that
risks an unreliable trial outcome and the consequent conviction
of an innocent person.'" Brown, 142 F. 3d at 539 (citations
omitted).

    With regard to Defendant's right to be present at all stages
of trial, absent any indication Defendant's motion contemplates
his lack of presence from any proceedings other than those on
October 15 and 16, 2003, he has not shown how a "fair and just"
hearing was "thwarted" by his absence from either the sidebar or
the *ex parte*, *in camera* inspection of a potentially privileged
document. "[G]ossamer possibilities of prejudice" are not enough

to require a new trial on the issue of presence. <u>Snyder</u>, 291 U.S. at 122. Accordingly, if this Court had jurisdiction over Defendant's claims, his motion for a new trial to cure alleged violations of his Sixth Amendment rights would be DENIED.

CONCLUSION

Because this Court has no jurisdiction over Defendant's claims, his oral motions are DENIED. And, because Defendant Andrews has failed to show that the evidence is insufficient to sustain a conviction and that no rational trier of fact could have found the Defendant guilty beyond a reasonable doubt, if this Court had jurisdiction over Defendant's claims, Defendant's oral Motion for Judgment of Acquittal made on 10/29/03 would be DENIED. Furthermore, because Defendant has failed to show that letting the jury verdict stand would be a manifest injustice, this Court would decline to exercise its discretion under Federal Rule of Criminal Procedure 33 and order a new trial. Accordingly, Defendant's oral Motion for New Trial made on 10/29/03 would also be DENIED.

SO ORDERED.

_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this ___ day of April, 2005.