UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. no. 3:00CR217(EBB) |
| | : | |
| BEN F. ANDREWS, | : | |
| Defendant. | : | April 22, 2005 |

## SENTENCING MEMORANDUM

### INTRODUCTION

The United States Probation Office has issued a presentence report (PSR) calculating Mr.

Andrews' guideline sentence based upon the November 1, 1998 sentencing guidelines. In United

States v. Booker, 125 S.Ct. 738 (2005), the Supreme Court declared unconstitutional and excised

from the federal sentencing statute, 18 U.S.C. § 3553, the mandatory sentencing provision set

forth in subsection (b)(1) of the stature.   In United States v. Crosby, 397 F.3d 103 (2d Cir.

2005), the Court of Appeals for the Second Circuit provided guidance to the district courts as to

how to apply Booker in future sentencings: the Court is to calculate the guideline range, which is

now advisory, and then make a determination as to whether, in light of the sentencing objectives

set forth in the federal sentencing statute, the sentence recommended by the Sentencing

Guidelines is reasonable.  If it is not, the sentencing court is free to impose that sentence that it

believes is reasonable under the circumstances.  In this case, a case very unlike the run-of-the-

mill sentencing, the Booker and Crosby decisions provide the Court with the authority to impose

a sentence that is both just and compassionate, a sentence that better advances the objectives of

the sentencing statute than the Sentencing Guidelines do.  The purpose of this memorandum is to

persuade the Court that in reaching its initial determination as to the guideline range, it should

downwardly depart, and that a lenient non-Guideline sentence is reasonable in light of the

objectives of the federal sentencing statute.

### FACTUAL BACKGROUND

The PSR (¶¶ 63-72 at pp. 18-19) calculates Mr. Andrews' offense level as follows:

Base offense level (§ 2C1.1). . . . . . . . . . . . . . . . . . . . . . . 10

Enhancement because two bribes involved (§ 2C1.1(b)(1). 2

2

Enhancement because of value (§ 2C1.1(b)(1)). . . . . . . . .11

Adjustment for obstruction (§§ 3C1.1) . . . . . . . . . . . . . . . .2


Total offense level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

This results in a guideline range of 57-71 months.


## ARGUMENT

## GUIDELINE CALCULATION


**1.  The Court should downwardly depart because Mr. Andrews has performed a lifetime of community service and innumerable good works.**

Ben Andrews, sixty-five years old, has served the community ever since the age of fourteen, when he lied about his age to serve the nation in Asia in the United States Air Force. He continued to serve the community during the difficult time when he was under indictment and facing trial.  There are hundreds, perhaps thousands, of persons in Connecticut who have benefitted from his good works, large and small.

U.S.S.G. § 5H1.11 provides that "[m]ilitary, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."

Nevertheless, the civic and charitable contributions of Ben Andrews are extraordinary to an extent that was not contemplated by the Guidelines.

The public contributions of Ben Andrews are well known.  He was a member of the National Board of Directors of the NAACP, chairman of the NAACP Resolution and Policy Committee, Chairman of the NAACP's ten-state Northeast Region, the state president and Chairman of the National Energy/Environment Committee. He was a domestic policy advisor to former president George Bush.  He served as minority leader of the Hartford City Council and was an unsuccessful Republican candidate in the First Congressional District and for Secretary of State.   For much of this work, he received no compensation.

3

Harold Rothstein, the CEO of a firm that built and rehabbed more than 1000 units in Hartford, writes from retirement in Florida of Ben's clear cool head and attempts to bring stability to Hartford at a time when riots were destroying whole areas of the city. The deputy mayor of Hartford, Veronica Airey-Wilson, writes of Ben's work on projects involving youth and business development. Thirman Milner and Carrie Saxon Perry -- two former mayors of Hartford and state representatives -- write that "he serves as an advisor and confidant for us as we continue in the struggle for justice and equality."

Julian Bond writes of Ben's work as the chairman of the NAACP's Resolutions Committee. The work requires shepherding resolutions through an often contentious body of delegates. "It is a tribute to Ben's personality, good humor and patience that his stewardship always brought him congratulations and praise even from those whose positions failed to carry the day. I have renominated him as Resolutions Committee Chair each year for five years -- and his Board peers have always unanimously confirmed him in that position."

John T. Brown, Jr., president, Stamford NAACP branch, writes that "for more than 20 years, Mr. Andrews and our agency worked on many projects focused upon helping families and individuals to survive severe economic conditions, getting them to medical care they desperately needed, assisting their children with special educational tutoring; but most importantly providing them with the real hope that their future and that of their children would be better and brighter." Other NAACP officials from throughout Connecticut, Baltimore, Louisiana, Boston and New Jersey have written to the Court describing Ben Andrew's passionate (but always good-humored and gentle) quest for justice and equality.

The letters to the Court describe not just public works, but also numerous private good acts. Yvette Thiesfield writes of one very special relationship with a young man " from a single parent household. He grew up in the north end of Hartford. . . .[O]ver the years, Ben became [his] surrogate father. . . .through Ben's quiet guidance and support,[his] life became a success story. He joined the city of Hartford's police department and in record time he rose to the rank of Detective. No one was prouder than Ben of [his] accomplishments." Nicole Mercado, the single mother of three boys, writes that after she had been rejected by the Hartford fire Department and

4

was temporarily waitressing, Ben's encouragement motivated her to keep trying and she is now, as she says, "a proud member of the department."

Carole Gellineau write of how Ben, learning that a friend he had not seen in many years was suffering from cancer and sitting in front of her apartment window hour after hour in great discomfort, bought and delivered to her a rocking chair and a computer. Doug Andrews writes how in fatter times, Ben helped one of his acquaintances who was about to lose her house with the mortgage payments until she could get back on track.

Kathleen Loomis writes of what a good next-door neighbor he was and a number of writers describe how, after major snowfalls, Ben Andrews would attach a plow to his truck and . plow out friends and neighbors.

A number of small-business entrepreneurs write about assistance and encouragement Ben Andrews has provided them. Joe Lewis of Super Joe Entertainment writes that after assisting him, Ben "never tried to hold it over my head or take credit for anything. He never said: remember the time when I helped you do this or that and he never asked anything of me." Nikki Ann Fulse writes of Ben's mentoring her in her attempts to begin a business. Barbara Ludlow Taussig writes of Ben dispensing advice and encouragement at restaurant lunches "Ben had grace. He literally had dozens of people of all walks of life in Hartford, black and white, rich and poor and everything in between, who would approach him in the restaurant and engage him in a discussion of their various pursuits."

Mr. Andrews' civic contributions – public and private -- over the course of his lifetime have been extraordinary to an extent not contemplated by the Sentencing Guidelines, and the Court should downwardly depart for this reason.

### 2. This Court should downwardly depart because the case is not a heartland offense in terms of the nature of the bribe.

An offender characteristic or other circumstance that is not ordinarily relevant in determining whether a sentence should be outside the guideline range may be relevant to the determination of a sentence if such characteristic or circumstance is present to an unusual degree and therefore distinguished the case from the heartland of cases covered by the Guidelines.

5

U.S.S.G. § 5K2.0.  This inquiry consists of a "refined assessment of the many facts bearing on the outcome, informed by [the sentencing court's] vantage point and day-to-day experience in criminal sentencing."  <u>Koon v. United States</u>, 518 U.S. 81, 106 (1996).  The sentencing court must consider whether some aspect of the case "take[s] it outside the Guidelines' 'heartland' and make[s] of it a special, or unusual, case."  <u>United States v. Merrit</u>, 988 F.2d 1298, 1306 (2d Cir. 1993), cert. denied, 508 U.S. 961 (1993).  "The Second Circuit has emphasized that a district court not only can, but must, consider the possibility of a downward . . . departure `when there are compelling considerations that take the case out of the heartland factors upon which the Guidelines rest.'"  <u>United States v. Somerstein</u>, 20 F.Supp.2d 454, 460 (E.D.N.Y. 1998)(<u>quoting United States v. Monk</u>, 15 F.3d 25, 29 (2d Cir. 1994)).  The Sentencing Guidelines "place essentially no limit on the number of potential factors that warrant a departure."  <u>Koon v. United States</u>, 518 U.S. 81, 106 (1996).

We believe that three facets of the offense conduct are not quite in the heartland of such offenses: first, in the general nature of the consulting contract involved; second, in the amount of the fraud; and third, in the number of alleged bribes.  That is, while the presentence report calculates the offense conduct correctly, the conduct is sufficiently outside the heartland of similar offenses so that, with respect to one factor or all in combination, the Court should depart.

We believe that the government's case may be fairly summarized thus:  Paul Silvester, close to deciding that he would invest state pension funds with Landmark, decided to strengthen the Republican ticket and pay back past kindnesses by getting Ben Andrews, the Republican candidate for secretary of state, a consulting job with Landmark.  He asked Jerome Wilson, an attorney with Rogers & Wells (a firm which had represented Landmark) to use his influence to arrange the matter.  Wilson, seeing an opportunity for his firm to earn further fees from Landmark, arranged with Stan Aulfeld of Landmark to hire Rogers and Wells as its consultant, with Ben Andrews in turn to serve as a consultant to Rogers and Wells.  We shall never know the conversation between Wilson and Aulfeld and the extent to which Wilson suggested that hiring Rogers & Wells with Ben Andrews on board would facilitate the Treasurer's investing with Landmark.

6

Meanwhile, the Treasurer, continuing a pattern that he had followed on earlier deals, sought to insert Stack into the deal by instructing Ben Andrews to take Stack on as partner. In doing so, the treasurer expected that Stack would remit a portion of the fees he received from Rogers & Wells to the treasurer himself. No one ever told Ben Andrews that the treasurer would be receiving moneys from Stack, but Silvester thought that Ben Andrews knew.

Ben Andrews, by contrast, testified that when he discovered that Landmark, a hometown firm, had made an investment proposal that seemed attractive to the treasurer, he asked Silvester for someone who could introduce him to Landmark. Silvester suggested Jerome Wilson; Ben Andrews asked Wilson to arrange for a meeting with Landmark personnel; Wilson took the ball and ran with it. Ben Andrews did not submit to the treasurer's instruction concerning Stack. He decided to take Stack on as a partner because he had observed that only Stack seemed to be able to influence the mercurial treasurer (although he did not know that the source of that influence was a series of corrupt schemes on which Stack and the treasurer had embarked).

The commentary to § 2C1.1 gives examples of heartland offenses covered by that section: "[a] government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2000 . . . ." Application note 2. "[A] small payment may be made in exchange for falsification of inspection records for a shipment of defective parachutes or the destruction of evidence in a major narcotics case. . . ." Application note 4. Getting a party loyalist a job with a firm hoping to do business with the state is different from such examples.

If Ben Andrews knew that Stack intended to provide a portion of the fees he received from Rogers & Wells to the treasurer, we recognize that this is a heartland bribery situation as envisioned by the Guidelines. The jury, however, was not required to find that this was the case: the payments to the treasurer's friend Stack, indeed the payments to Ben himself, could be found to be corrupt payments, even if Ben had no knowledge of the arrangement between Stack and the treasurer. For this reason, the case is outside the heartland of offenses as envisioned in the guidelines.

The government's tripartite theory of the case is disturbing because, if Ben Andrews did

7

not know that Stack intended to give moneys to Silvester, it is understandable that Mr. Andrews should not have understood that what he did was wrong. Many of the writers of letters in Mr. Andrews' behalf express the view that Mr. Andrews could not have known that what he did was wrong. In selling himself to Landmark, Ben Andrews was selling his friendliness with the treasurer and his staff and the access which that friendliness obtained. Firms hire consultants (and lobbyists and public relations specialists) to get access and, they hope, friendly treatment, and, as we argue below, this has been a longstanding practice that has generally not been prosecuted as a federal offense. Ben Andrews' case is disturbing because, if a public official makes a decision based in any part on his consideration that someone with whom he is friendly will profit by that decision -- even if he believes that the decision is in the best interests of the public entity he serves -- his friend is guilty of accepting a bribe.

Obviously, a line must be drawn somewhere, but it is difficult to perceive where the line might lie. To give an example, close to home: Across the nation and in this district, a good number of federal prosecutors have been hired because the judges for whom they have clerked have made strong recommendations in their behalf to the United States Attorney. Obviously, there is no quid pro quo in this situation: we are sure that no United States Attorney has ever telephoned a judge and told him or her that the clerk would be hired if a certain government motion were to be granted. Nevertheless, suppose that a United States Attorney were to feel that there were a number of highly qualified applicants for the job, that the judge's clerk was among the most highly qualified, and that one reason, among many, that the former clerk should be hired was in order to please the district judge, in the hope that the hiring would contribute to continuing the cordial relationship between his office and the court in which his office regularly litigated. If a United States Attorney were to make such an admission, would the judge's clerk on the day he was sworn to defend the constitution be guilty, like Ben Andrews, of accepting the gratuity of the job? Would his former boss?

**3. This Court should downwardly depart because the case is not a heartland offense in terms of the amount of the bribe.**

8

The presentence report states "[t]he value of the bribe was $1.5 million and therefore, an 11 level increase is warranted pursuant to §§ 2C1.1(b)(1) and 2F1.1(b)(1)(L)." PSR ¶ 66. This eleven-level increase is greater than the base offense level itself and adds a considerable amount of time to the guideline range. Section 2C1.1(b)(2) does require increasing the base offense level by "the value of the payment" and directs that the fraud calculations of § 2F1.1 be used.

The union between the bribery guideline and the fraud guideline is sometimes uneasy. It is particularly uneasy in this case, because although Mr. Andrews, Rogers & Wells, and Stack (and through Stack, Silvester) were to get fees out of Landmark, the monetary loss to the state itself is more difficult to measure. Silvester clearly had come very close to a decision to invest in Landmark because he (and his staff) thought it was an attractive investment for the state. Although he testified at trial that he would not have invested with Landmark had Landmark not employed Mr. Andrews, we think that Silvester's testimony can be accurately summarized by saying that having decided that Landmark was a good investment that he wanted to make, he realized that he could help a running mate by getting him a job there and that Landmark's Aulfeld, anxious to close the deal, was likely to accede to Jerome Wilson's suggestion, however that suggestion may have been made, that it take on Mr. Andrews.

Now, it is easy to contend that the state was defrauded of the moneys that Landmark would have paid to Andrews, Stack and (presumably) Rogers & Wells because if Landmark had not hired consultants, the state could have negotiated successfully to lower Landmark's fee by that amount. The matter, however, is not that simple. The fees charged by investment funds tend to be very similar and investment fund agreements often contain "most-favored-nation" clauses that provide that if the fund charges a lesser fee to one customer it must charge the same fee to others. Reducing the state's fee might well have resulted in the reduction of fees owed by other clients.

It is important to note that although $1.5 million was agreed upon, it was not paid. Landmark actually paid $500,000 through Rogers & Wells to Mr. Andrews and Stack. Of this, Silvester got nothing, if one considers that the moneys that Stack did pay Silvester were due on earlier deals. Stack probably eventually would have paid $125,000 to Silvester (if he did not

double cross him, and if he had, to whom would Silvester have brought a complaint?).

The Background to § 2C1.1(b)(2) provides that "solicitations and attempts are to be treated as equivalent to the underlying offense," but as with everything else in this case, the matter is complicated. Is the $250,000 that was retained by Rogers and Wells to be considered a bribe? If the jury determined that Mr. Andrews did not know that Stack intended to provide a portion of his fee to the Treasurer, was Stack's fee a bribe?

Finally, it is undisputed that Ben Andrews did a considerable amount of work for Landmark in exchange for his consulting fee. He did a year's worth of groundwork to cause to the firm to be added to the AFL-CIO's very limited list of approved firms for the investment of pension funds, bringing Landmark personnel to a meeting of the AFL-CIO roundtable of money managers in Florida and to a conference of the AFL-CIO executive committee in California . He was well on his way to persuading the municipality of Baltimore's retirement fund to invest with Landmark and also had promising signs of interest by the Ohio Worker's Compensation Commission (which, at Mr. Andrew's urging, had previously invested with Smith, Whiley). None of this bore fruit, because the highly publicized investigation which led to the indictment in this case understandably caused potential investors to shy away from the deals on which Mr. Andrews was working. Nevertheless, in calculating the value of the payment, should we subtract the value of the work that Ben Andrews performed for the payment? Certainly the Guidelines, in an analogous situation, suggest that such a subtraction is permissible. Application note 7(a) instructs that where the fraud consists of overvaluing something that does have value, the amount of the fraud is the difference between the puffed-up value and the fair market value of the item.

It is common for those in positions of power and prestige to use their influence and persuasive powers to obtain employment for their proteges, associates, friends and sometimes relatives. When the person who provides the employment does so because he hopes for something in return, it may be difficult to calculate the value of what a jury may ultimately determine to have been a bribe. This is such a case, and the Court should downwardly depart because, at least with respect to the value of the payment, the value as calculated in the presentence report is outside the heartland of the Guidelines' contemplation of corrupt payments.

**4. This Court should downwardly depart because although the increase in the Landmark investment from $1,000,000 to $1,500,000 may be seen as involving a second bribe, the increase in the amount to be paid under the consulting contract is, in essence, a single bribe.**

The presentence report adds two levels because "the offense involved more than one bribe . . . . "  In this case, the state entered into a contract with Landmark which allowed the state to increase its initial investment; it did so following the treasurer's electoral defeat; the amount of the Rogers & Wells commission, which was set at a percentage of the state's investment with Landmark, correspondingly  increased; consequently the amount which Rogers & Wells intended to pay Ben Andrews and Stack increased.  (The increase was, as noted above, never paid.)  Application Note 6 provides that "[r]elated payments that, in essence, constitute a single incident of bribery . . .(e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separated counts."  In this case, while the increase in commission is not an additional installment payment on a single agreement, it is also not fully independent of the state's initial contract with Landmark, either.  Given that the increase in the amount due under the consulting contract is also reflected in the Guideline's calculation of the value of the payment, this increase does not appear to be in the heartland of what the Guidelines consider a second payment.

**5. This Court should downwardly depart because Mr. Andrews' offense constituted aberrant conduct.**

Departures for aberrant conduct were limited by U.S.S.G. § 5K2.20, but that amendment to the sentencing guidelines became effective on November 1, 2000, so those limitations are not applicable to Mr. Andrews, given that this sentence is to be calculated utilizing the version of the Guidelines that went into effect on November 1, 1998.  In December of 1998, in Zecevic v. United States Parole Commission, 163 F.3d 731 (2d Cir. 1998), the Court of Appeals held that "aberrant behavior is conduct which constitutes a short-lived departure from an otherwise law-abiding life, and that the best test by which to judge whether conduct is truly aberrant is the totality test." 163 F.3d at 735 [internal quotations omitted].  We have argued at p. 14, infra, and will not repeat here, that prior to Mr. Andrews' prosecution, it was not clear that accepting

lucrative compensation as a politically well-connected consultant to firms doing business with the state was a crime: numerous other consultants were well known to have done so and were not prosecuted for similar conduct; such consultants have never in the past been prosecuted; they do not seem to have been prosecuted since. We have also argued at p. 2, <u>supra</u>, and will not repeat here, that Mr. Andrews has spent a lifetime not only without a criminal conviction but also with great merit and accomplishments. In this context, his serving as a consultant to Rogers & Wells and accepting fees that ultimately came from Landmark should be seen as aberrant.

### 5. The Court should downwardly depart because of Mr. Andrews' age and health.

The U.S.S.G. Policy Statement set forth at § 5H1.1 provides:

> Age (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement may be equally efficient as and less costly than incarceration. . . .

The U.S.S.G. Policy Statement set forth at § 5H1.4 provides:

> Physical condition . . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline; <u>e.g.</u>, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly that, imprisonment.

Mr. Andrews is sixty-five years old. As the letter from his treating physician (attached hereto) indicates, he suffers from diabetes (for which Amaryl 2/4 mg tablet AVE and Actos 10 mg tablet TAK are prescribed daily), high blood pressure and high cholesterol (for which Altace 10 mg capsule MON and Crestor 10 MG tablet ZEN are prescribed daily), a heart condition (for which Toprol XL 50 mg tablet SA AST is prescribed daily) and glaucoma (for which daily eye drops are used).

While Mr. Andrews is not "elderly and infirm" and while he does not suffer from an "extraordinary physical impairment," his age and physical condition should be considered by the Court in its sentence. His age should be considered because Mr. Andrews has had a lifetime

12

within which to demonstrate his good character. (There is a vast difference between an eighteen-year-old defendant about to embark upon a life of crime who falls into criminal history category I simply because he has not yet had time to work his way up, and Mr. Andrews who has spent an interesting and valuable lifetime.) I t should also be considered that, at least in this writer's experience, with advancing age each day becomes more precious. Mr. Andrews' health should be considered because illness, even if not life-threatening, will increase the difficulty of a prison sentence. (While it is difficult to be separated from the people one loves, to be separated and ill must be truly miserable.)

While we cannot argue that Mr. Andrews' age and health are so extraordinary as to justify a downward departure in themselves, we hope that in combination with other factors they may justify such a departure.

### 6. The Court should downwardly depart because of a combination of factors.

At least since the Court of Appeals' affirmance of this Court's sentencing in <u>United States v. Rioux</u>, 97 F.3d.648 (1996), it has been recognized that "[i]n extraordinary cases . . . the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from the heartland case covered by the guidelines." 97 F.3d at 662-63 [internal quotations omitted].

Other factors that have not been mentioned previously in this memorandum include Mr. Andrews' lifetime of employment (the jobs that financed his public service). A defendant's employment record can be a basis, in combination with other factors, upon which a sentencing court may depart from the guidelines. <u>See</u> <u>United States v. Caruso</u>, 814 F.Supp. 882, 884 (S.D.N.Y. 1993)(defendant's age, good employment record and likely future compliance with the law, taken in combination, justified a downward departure). <u>Cf.</u> <u>United States v. Bryson</u>, 163 F.3d 742, 749 (2d Cir. 1998)(recognizing that "[t]he achievement of the ordinary responsibilities of citizenship, such as regular employment and support of dependants may, depending on the starting point of rehabilitation, be sufficient [to justify departure], if that achievement is the

13

product of a substantial commitment sustained over time."). <u>See also</u> <u>United States v.</u>

<u>Jagmohan</u>, 909 F.2d 61 (2d Cir. 1990); <u>United States v. Rogan</u>, 952 F.2d 1049 (8th Cir. 1992);

<u>United States v. Big Crow</u>, 898 F.2d 1236 (8th Cir. 1990), <u>cert. denied</u>, 111 S.Ct. 1077 (1991);

<u>United States v. Naylor</u>, 735 F.Supp. 928 (D.MN. 1990).

## REASONABLENESS OF SENTENCE IN
## LIGHT OF THE SENTENCING STATUTE

### 1. The sentencing statute instructs courts to consider a number of factors and, in particular, to sentence defendants with an eye to others similarly situated.

As Judge Newman wrote in <u>Crosby</u>, "[p]rior to <u>Booker/Fanfan</u>, the section 3553(a)

requirement that the sentencing judge 'consider' all of the factors enumerated in that section had

an uncertain import because subsection 3553(b)(1) required judges to select a sentence within the

applicable Guidelines range unless the statutory standard for a departure was met. Now, with the

mandatory duty to apply the Guidelines excised, the duty imposed by section 3553(a) to

'consider' numerous factors acquires renewed significance." While the Guidelines have not been

discarded, the Guidelines are now one factor, among the other factors set forth in § 3553(a), that

a sentencing court must consider.

Among the factors that the Court must consider are:

*(1) the nature and circumstances of the offense and the history and characteristics of*

*the defendant.*   While the Guidelines severely limit the Court's consideration of the history and

characteristics of a defendant, <u>see, e.g.</u>, U.S.S.G. § 5H1.11 (limiting court's consideration of good

works of defendant)( discussed above), the Court is instructed to take the defendant's history and

character into consideration. That character and history has been discussed in the presentence

report and above.

(2) the need for the sentence imposed to reflect the seriousness of the offense, to provide

adequate deterrence to criminal conduct, to protect the public from further crimes of the

defendant and to provide the defendant with correctional treatment in the most effective manner.

A lengthy sentence is not required to achieve these objectives. For persons in Ben Andrews'

position, the notoriety arising from a lengthy, highly publicized criminal investigation is an acute punishment.  As a consequence (as noted above), deals that Mr. Andrews was hoping to put together in Baltimore and Ohio were stymied.  Payments that he expected from Smith, Whiley and from Brown Capital were withheld.  This investigation and prosecution have financially ruined Ben Andrews, and if it were not for his good luck in being married to a professional wife who is financially stable, his outlook would be dire indeed.  The SEC, as a result of this conviction, is seeking to impose monetary penalties that Mr. Andrews would never be able to pay and orders that would bar him from participating in any significant way in any publicly held company for life.  For many white-collar crimes, the prospect of investigation, the financial destruction that comes with an indictment, and the shame that comes with a conviction are sufficient to achieve the requisite deterrence. A prison sentence does not provide significantly added deterrence.  As retired Mississippi Supreme Court Justice Fred L. Banks writes in his letter to the Court, Ben's "[c]onviction is a devastating blow which has exacted and will continue to exact a  grave punishment upon Ben and his family."   Isolation of Ben Andrews from society would not benefit society -- the harm that Ben Andrews has done is far outweighed by the good.  Ben Andrews has little need for correctional treatment.

(3) the kinds of sentences available.  Because there is no mandatory minimum, the Court is free to fashion a sentence that combines imprisonment, home arrest and supervised release.

(4)-(5) as noted, the Court must consider that applicable Sentencing Guidelines and the Sentencing Commission's policy statements.

(6)  Section 3553 provides that sentencing judges are to consider "(6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."  Serious consideration of this factor indicates that Mr. Andrews should be sentenced leniently.

We request the Court to consider four categories of persons who are arguably similarly situated: those involved with Mr. Andrews in the Landmark matter, which, of course,  the Court tried; those involved in the Triumph matter, which is described in the indictment in which Mr. Andrews is charged, one of whom (Charles Spadoni) the Court also tried and three of whom it

sentenced; those referred to in the information to which Paul Silvester pleaded guilty; and the former governor.

A. Those involved in the Landmark matter. Other than the treasurer himself, who pleaded guilty to an information charging bribery in connection with investments in four other entities as well as Landmark, the only person who has been charged in this matter is Ben Andrews. The government did not charge Landmark, the entity that paid the alleged bribes and profited from the Treasurer's decision. The government did not charge Stan Aulfeld, the chief executive officer of Landmark, who made the decision to hire Rogers & Wells (and, through Rogers & Wells, Ben Andrews) as a consultant. The government did not prosecute Rogers & Wells, the prestigious law firm named after a Secretary of State, that hired Mr. Andrews as its consultant and which received fees roughly in the same amount as Ben Andrews. The government did not prosecute Jerome Wilson, the Rogers & Wells attorney who Silvester says he requested meet with Aulfeld and set up the consulting agreement that would profit both Ben Andrews and Wilson's own firm, and who, apparently, had done this sort of thing in the past. The government did not prosecute Christopher Stack, the deeply corrupt attorney who started the treasurer down the path of bribery and who was to receive the same consulting fee as Ben Andrews.

The government did prosecute Paul Silvester -- but the Landmark fund was only one of the five funds from which the treasurer expected to receive bribes. As a result of his guilty plea to an information charging improper activities with respect not only to Landmark but also with respect to the Thayer, Carlyle, Keystone and Triumph funds, Paul Sylvester was sentenced to 51 months' imprisonment and three years' supervised release.

**B. Those specifically named in the indictment.** The indictment in which Ben Andrews was charged also charged Triumph Capital of Boston, Frederick W. McCarthy, Lisa Thiesfield and George Spadoni in a different scheme.

Frederick W. McCarthy pleaded guilty to count 19 of the superceding indictment, which charged him with corruptly rewarding a public official, in violation of 18 U.S.C. § 666. He had agreed to pay Stack and Thiesfield one million dollars each in order to obtain a $200 million

16

investment contract for Triumph Capital, a firm owned by him and his children's trusts.   He was sentenced to one year and one day.

While it is true that Mr. McCarthy entered a guilty plea and that Mr. Andrews took the case to trial, it should be observed that the amount of effort the prosecution and the trial court were required to expend in responding to and deciding pretrial matters in the Triumph Capital case was probably greater than that expended in trying Ben Andrews and that Mr. McCarthy's conduct was, we believe, more serious, although he pleaded guilty pursuant to a plea agreement to a less serious charge..

Lisa Thiesfield, Mr. Andrews' sister-in-law,  pleaded guilty to count 18 of the indictment, charging a violation of 18 U.S.C. § 666.  She was sentenced to 6 months incarceration and 6 months home arrest.

Mr. Spadoni awaits sentencing.

**C.   Those believed to be co-conspirators by the government in similar deals.**  As noted, in addition to the Landmark and Triumph deals, Paul Silvester pleaded guilty to corrupt involvement with three other funds: Thayer, Carlyle and Keystone.  As the Court is aware from the trial of this case and the Spadoni case, a number of prominent political and business figures were involved in these three deals.  None has been charged, and, given that the general federal statute of limitations is five years, it does not appear that any will be.  So far as we can tell, although the practice of firms hiring politically well-connected figures to serve as consultants in order to attract state investment has previously been commonplace, the only such consultant who has been indicted is Ben Andrews.

**D.   The governor.**  As this Court is fully aware, the governor on whose ticket Silvester and Ben Andrews ran has been sentenced to a year and a day.  He, like McCarthy, pleaded guilty pursuant to a plea agreement, but his conduct, involving as it did abuse of the public trust in a series of matters, was surely more serious than that of Ben Andrews.

If both the governor and Mr. McCarthy were sentenced to one year and one day, it would seem that to sentence Mr. Andrews to more would create the kind of  "unwanted sentence disparit[y]" that § 3553(a)(6) seeks to avoid.  This is particularly true in that others in the same

position as Mr. Andrews have never been prosecuted at all.

## CONCLUSION

In other cases, the undersigned tries not to inundate a sentencing judge with letters from those who know and love the defendant. In this case, however, the number of people who felt strongly that they had to communicate with the Court concerning Mr. Andrews' sentencing is large, and their letters heartfelt, and we thank the Court for expending the significant time that has been required in reading them. These sentencing letters, we believe, are unusual. These are not the standard letters that one expects in a sentencing. ("He's my son and he couldn't have done anything bad.." "He's my dad and he was always there for us.") These are thoroughly considered, carefully crafted, passionately argued letters. Some are from people who knew Mr. Andrews in politics. Some are from people with whom he worked in the NAACP. Many are from entrepeneurs, owners of small businesses, to whom he provided advice and assistance. Some are from religious leaders -- from Baptist ministers and the rabbi who served as chaplain to the state senate --  attesting to a deep spirituality that is integral to Mr. Andrews' social commitment. Some are from loving family members.

The same words are used over and over to describe Mr. Andrews. He is man of strong intellect, high morality, great compassion, deep commitment, with tremendous passion for the marginalized. He prizes education and loses no opportunity to urge it on those who seek his advice, and he is generous with his own knowledge. He is, a leader, hard working, decent, caring, good, kind, loving, and thoughtful. Unlike many defendants in criminal cases, he is universally described as warm-hearted, even-tempered and gentle.

Sentencing, of course, is not a popularity contest and we do not suggest that a sentence should be reduced to the extent that a defendant is well-liked. The love that people feel for Ben Andrews, however, comes not from surface charm -- although that charm should not be minimized -- but from a sense that he is a good, modest, compassionate man who is ever ready to lend a hand to his fellow man, in matters great and small.

Of course, many of those whom Ben Andrews have helped the most -- the poor, the dispossessed -- have not written. While this case was receiving widespread publicity, a number

of people approached this writer and said, "Give Ben my best. He won't remember me but ten years ago in Middletown (or New London or Waterbury), he helped me out." They would go on to describe some act of kindness, great or small, that they still had not forgotten. At a restaurant lunch following our PSR interview with Probation Officer Lopez, a Yale oncologist approached our table and reminded Mr. Andrews of how, as a member of a blue ribbon commission established by Governor Grasso decades ago, he had worked hard with the doctor behind the scenes in order to cobble together the necessary votes to recommend restoring the state funding needed to construct a cancer treatment center. Many lives, the doctor asserted, had been saved by Ben's action.

This is an extraordinary sentencing of an unusual man. One of the letter writers told the Court that "as I compose this letter, I feel my hands and my body shaking because of the power that is vested in the person presiding as judge: will [she] protect society and its interests and in what manner? I pray that the presiding judge in this case will extend mercy to Ben Andrews." In this case, unlike cases prior to Booker and Crosby, the Court is empowered to reach a fair and compassionate sentence that advances the objectives of the federal sentencing statute in a manner that allows for consideration of all the aspects of Ben Andrews' life and the offenses for which he will be sentenced. If the Court considers the entirety of Mr. Andrews' life, we feel confident that the Court will heed the plea of the trembling letter writer (and of many others who have written, as well) and "extend mercy to Ben Andrews."

Respectfully submitted,


JEREMIAH DONOVAN
123 Elm Street--Unit 400
P.O. Box 554
Old Saybrook, CT 06475
(860) 388-3750
FAX 388-3181
Juris no. 305346
Fed.bar.no. CT 03536

19

## **CERTIFICATION**

This is to certify that on this April 27, 2005, a copy of the above and foregoing was hand delivered to David Ring, Assistant United States Attorney, Post Office Box 1824, New Haven, CT 06510.

_____
Jeremiah Donovan