UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA           Crim. No. 3:00-CR-217 (EBB)

v.

BEN F. ANDREWS           April 29, 2005

**UNITED STATES' RESPONSE TO DEFENDANT ANDREWS'
<u>SENTENCING MEMORANDUM</u>**

### I. <u>Introduction</u>

On April 27, 2005, defendant Andrews filed a Sentencing Memorandum [doc. # 917], offering numerous reasons why this Court ought to impose a "lenient" sentence. What is most notable about the sentencing memorandum, however, is what is missing – the slightest glimmer of remorse. Nowhere does Ben Andrews apologize for anything: for participating in a $1.5 million bribe scheme, for helping to defraud the citizens of Connecticut of the honest services of their State Treasurer, for laundering bribe money though the State Treasurer's crony, Christopher Stack, or for lying to federal investigators who were trying to unravel the web of deceit. Nowhere does he apologize to the Court or the jury for spending two days on the witness stand lying about his involvement in these schemes. Instead, he minimizes the criminality of his conduct and continues to challenge the jury's unanimous verdict. His refusal to acknowledge the wrongfulness of his actions undermines his pleas for leniency. For the reasons that follow, the Government respectfully submits that the Court should reject the defendant's requests for leniency at sentencing.

## II. **Background**

The evidence at trial proved that Paul Silvester inserted the defendant in a $100 million investment deal with Landmark Partners in order to obtain a enormous consulting fee for the defendant; that Silvester insisted that the defendant split his fee with Christopher Stack; that the defendant agreed to enter the deal and split his fee, knowing that neither he nor Stack would do any meaningful work on the deal; that Silvester agreed to add another $50 million to the Landmark investment if the defendant received an additional fee for this investment and agreed to split it with Stack; and that the defendant engaged in this conduct knowing that Paul Silvester was using the power of his elected position to obtain $1.5 million in undeserving fees that would be split amongst the defendant, Stack and Silvester himself.  Nonetheless, throughout his sentencing memo, the defendant repeats the version of events that the jury plainly rejected: that he was an unwitting dupe who sought to cash in on his business connections in a manner that constituted non-criminal "business as usual," as it was conducted in the State of Connecticut.  In making these sweeping and self-serving claims about his lack of criminal intent, the defendant ignores the numerous contradictions in his testimony that were revealed at trial.  Most notably, the defendant continues to deny that he agreed to split his fee in half with Chris Stack because Silvester insisted that he do so, and instead presses the claim that he *independently* came up with the idea to split his fee with Stack – *the morning after Silvester insisted on it* – because Stack

seemed able to "influence the mercurial treasurer." *See* Def. Mem. at 6.[1] The jury, of course, disagreed, and that is what brings the defendant before the Court for sentencing.

### III. Discussion

The defendant advances several specific claims for downward departure that will be addressed in detail below. Before discussing those claims, however, it is important to point out that the undercurrent running through the defendant's sentencing memorandum is his continual protestation (a) that he did nothing criminal, and (b) that any harm caused by his conduct is far outweighed by the good that he has done throughout his life. It surely is the case that the defendant has done much good during his life. Yet it is impossible to determine what significance to give this good without fairly looking at the criminality of the defendant's acts, as well as the public *harm* that he is perpetuating by pretending that the criminal justice system has wrongly convicted an innocent man.

The defendant's mischaracterization of the facts of this case is best illustrated by his analogy of his criminal scheme to that in which a United States Attorney hires a district judge's law clerk in part for the purpose of pleasing the judge. *See* Def. Mem. at 7. Nothing could be further from the facts of the instant case. For the defendant's analogy to succeed, the law clerk would have to be hired to a no-show job, and would have been required to split the no-show salary with the recommending judge or the judge's lackey. The defendant's refusal to

---

[1] Interestingly, in pressing his assertion that he agreed to split his million-dollar fee with Stack because of Stack's special influence with the treasurer, the defendant forgets the extent to which he repeatedly *denied* this very same assertion during cross-examination at trial. *See generally* 10/24/03 Tr. at 35-39; 41-44. Indeed, when the defendant was read the transcript of his testimony on *direct* examination in which he said that he brought Stack into the deal because "*he had tremendous influence regarding Paul Silvester*" (10/22/03 (afternoon) Tr. at 38) (emphasis added), the defendant proclaimed that the court reporter – or her machine – must have gotten it wrong.

-3-

acknowledge that he received an enormous fee from a corrupt State Treasurer for doing nothing, as well as his refusal to acknowledge that, at the very least, he was willing to split his unearned fee with another lackey at the direction of the Treasurer, highlights the defendant's complete lack of contrition in this case.

This lack of contrition leads to a central problem with the defendant's plea for leniency. In his brief, the defendant points to letters written by his supporters in which they express the view that the defendant could not *possibly* have known that what he was doing was wrong. *See* Def. Mem. at 7. The defendant's protestations of innocence to his friends, as with his similar protestations to the Court, show that the defendant is still perpetuating the belief that the criminal justice system has failed him, and that he was wrongly convicted of a crime – just as he and his lawyer did on the courthouse steps after the jury returned its unanimous verdict. While the defendant claims (among other things) that the "shame that comes with a conviction" is sufficient punishment for his crime (*see id.* at 14), it seems plain that the defendant feels no such shame and has suffered no such punishment.

The evidence at trial proved that the defendant participated in a corrupt political scheme, in which the State Treasurer's office was used to profit Paul Silvester and his friends. The evidence also showed that the defendant attempted to obstruct a criminal investigation by imploring others to lie, that he lied himself to federal agents, and that he lied again throughout his testimony at trial. When the Court imposes sentence on the defendant, the Government respectfully requests that the Court keep in mind the extent of the defendant's corrupt conduct, which helped to shake the public's confidence in their state government, as well as the extent to which he has repeatedly sought to undermine the criminal justice system, including the public's

faith in that system. In weighing the appropriate sentence, the Court should be mindful of the fact that the defendant has *not* expressed contrition or shame. And, further, the Court should impose a sentence which clearly and unambiguously shows that the defendant *did* commit a serious crime, that his actions do *not* fall within some morally ambiguous gray zone, and that the defendant *did* lie extensively throughout his testimony.

For the reasons that follow, a sentence within the guidelines range would be appropriate punishment in this case, and the defendant's specific claims for a downward departure should be denied.

### A.     The Defendant's Corrupt Scheme Was Within the Heartland of the Bribery Guidelines

The defendant argues that three aspects of the bribe offense "are not quite in the heartland of such offenses": (1) the nature of the "consulting contract" given to him by Landmark; (2) the dollar amount of the fraud, and (3) the number of bribes. Def. Mem. at 5. Each argument unduly minimizes the defendant's culpability.

First, the defendant is incorrect, as a factual and a legal matter, in arguing that the nature of his "consulting contract" scheme was outside the heartland of bribery offenses. His argument rests on the faulty premise that the jury did not find that he knew Stack would kick back money to Silvester. As a factual matter, the jury *necessarily concluded* that the defendant knew that part of the Landmark fees were going to be kicked back to Silvester. Specifically, on the money-laundering charge (Count 11), this Court correctly instructed that the defendant could be guilty of conspiring to commit money laundering only if the defendant knowingly joined a conspiracy in which "the consulting contract with Landmark and the arrangement with Christopher Stack, *were*

*means to make corrupt payments to Silvester.*" Jury Instr. at 69 (emphasis added).[2] During closing arguments, the Government emphasized this distinction between the money-laundering and bribery/fraud counts, the latter of which (by contrast) could have been supported by an intent to benefit either Silvester, Stack, or the defendant. By convicting on Count 11, the jury must have credited Silvester's testimony (flatly denied by the defendant) that while discussing the defendant's fees arising out of the $100 million Landmark investment, the defendant inquired how Silvester "might want [his] share," and later asked Silvester whether he wanted his "boy in New York taken care of." 10/17/03 Tr. at 107, 108. Silvester also testified that after he instructed Andrews to split his fee with Stack, Andrews told Silvester that "it was going to cost [Silvester] more to do business with Mr. Stack in this deal." 10/17/2003 Tr. at 126. Even the defendant acknowledges that "[i]f Ben Andrews knew that Stack intended to provide a portion of the fees he received from Rogers & Wells to the treasurer, we recognize that this is a heartland bribery situation as envisioned by the Guidelines." Def. Mem. at 6. Because the jury necessarily found that Andrews was aware of the kickback scheme, this case falls squarely in the heartland of bribery cases.

Moreover, his argument falters as a legal matter. Even if he had not known about the kickbacks to Silvester, Andrews knew that the $1.5 million in fees he was splitting with Stack had influenced Silvester's decision to invest $150 million of state pension funds with Landmark. It is dishonest for public officials to demand cash for their actions, regardless of whether the cash goes into their own pockets or into the pockets of their cronies. The jury found that Andrews

---

[2] The Government has not obtained an official transcript of the Court's jury instructions, and therefore cites to the final draft circulated to the parties by the Court.

knew of Silvester's corrupt intent. In short, this is not a case where "it is difficult to perceive where the line might lie" between honesty and graft. Def. Mem. at 7.

Second, it makes eminently good sense to key the defendant's punishment in part to the amount of the $1.5 million bribes. That is the amount that the three co-conspirators meant to split among themselves. To put the scale of those bribes into perspective, the three conspirators arrogated to themselves – by manipulating money held in trust for Connecticut citizens, in exchange for no work by themselves – fees amounting to *more than thirty-three times the median income* of a Connecticut household in 1998.[3] It is certainly true that the monetary loss to the State of Connecticut is hard to measure, because one simply cannot turn back the clock and know where the $150 million in state pension funds would have been invested, if Silvester, Stack, and Andrews had not succeeded in their illicit scheme. That is precisely the reason why the defendant's culpability is best measured by the profits that the co-conspirators attempted to pocket. (As for the fact that Landmark never paid all of the $1.5 million in illicit fees, that is attributable only to the determined work of federal law enforcement, which uncovered the bribe scheme before all of the corrupt payments could be disbursed. The defendant deserves no leniency simply because he was caught.)

Third, contrary to the defendant's claims, the trial evidence showed quite conclusively that the defendant did *virtually nothing* for Landmark in exchange for the $1.5 million fee he divided with Stack. On direct examination, as well as when pressed on cross-examination, all Andrews could remember having done was (1) to recommend that Stan Alfeld attend the *closing*

---

[3]*See* U.S. Census Bureau, *Money Income in the United States* xvi (1998) ( Table D: "Median Income of Households by State") (noting three-year average from 1996-1998 for Connecticut households was $44,978).

of the deal (10/22/03 (afternoon) Tr. 39); (2) to ask Paul Silvester about the amount he wanted to invest with Landmark in the first deal (which Silvester had already decided to do) (10/23/03 Tr. 131); (3) to draft a pointless letter from Landmark to Paul Silvester, forwarding an offering memo that had already been sent to the Treasurer's Office (Exhibit 80; 10/23/03 Tr. 136-46); and (4) to ask Silvester to increase the Landmark investment after the November 1998 electoral defeat (10/24/03 Tr. 61-62).  Importantly, all of the $1.5 million fees awarded to Andrews were attributable solely to the *Connecticut investment* – indeed, the compensation was pegged at 1% of the amount that Connecticut invested in Landmark.  All of the work that Andrews did (quite unsuccessfully, as it turned out) in connection with Ohio, Baltimore, and others was to be separately compensated under arrangements to be reached on a case-by-case basis, according to the contract between Andrews and Landmark.  *See* Ex. 10 (Letter from Jerome L. Wilson dated May 28, 1998); *see also* Ex. 75, p. 10 (Letter dated Nov. 12, 1998, extending original retention agreement to other funds).  In short, having performed no work in exchange for the $1.5 million in corrupt payments from Landmark, Andrews deserves no credit for unrelated work he may have done later in hopes of additional fees.

    **B.**    **The Two Landmark Fees Are Properly Counted as Separate Bribes Under the Sentencing Guidelines**

The defendant obtained a $1 million fee based on Silvester's investment of $100 million in state pension funds with Landmark in July 1998, and another $50 million in December 1998.  The defendant concedes that under the bribery guidelines, these two bribes must be treated as distinct incidents.  *See* U.S.S.G. § 2C1.1, app. note 6; Def. Mem. at 10.  The defendant asks for leniency, however, on the grounds that the two bribes were not "fully independent" of one another.  *Id.*  This is a curious proposition.  It amounts to a claim that when a criminal has an

*ongoing corrupt relationship* with a state official, whereby they engage in *repeated joint wrongdoing*, the severity of his criminal activity is somehow lessened. The Government respectfully submits that the pervasively corrupt relationship between Silvester and Andrews – manifested by multiple bribes, as well as their other illicit conduct such as straw campaign contributions – demonstrates the defendant's *heightened*, not *reduced*, culpability.

### C. The Defendant Has Not Demonstrated That His Misconduct, Over the Span of Five Years, Constituted "Aberrant Conduct"

The defendant further argues that he is entitled to leniency because his misconduct was "aberrant" – that is, a "'short-lived departure from an otherwise law-abiding life.'" Def. Mem. at 10 (quoting *Zecevic v. United States Parole Commission*, 163 F.3d 731 (2d Cir. 1998)). In support, he argues (1) that it was "not clear" prior to his prosecution that his conduct "was a crime"; and (2) that he had spent a lifetime "without a criminal conviction" and "with great merit and accomplishments." Def. Mem. at 10-11. As to the first point: For the reasons set forth in Point B above, it would be perfectly apparent to anyone – and it was certainly apparent to the jury – that this conduct was criminal, because Andrews knew that Silvester had solicited the $1.5 million in fees to influence his investment decisions; because Andrews split the money with Stack to influence Silvester's decisions; and because Andrews knew that some of Stack's money was being kicked back to Silvester.

Moreover, the defendant's criminal conduct cannot fairly be described as a "short-lived departure from an otherwise law-abiding life." First, misconduct that stretches over many months is not "short-lived." *See Zecevic*, 163 F.3d at 736-37 (affirming denial of aberrant-behavior departure, where defendant engaged in "elaborate scheme" to smuggle drugs into Sweden and carried out plan over several months); *see also United States v. Martinez*, 207 F.3d

-9-

133, 137 (2d Cir. 2000) (vacating aberrant-conduct departure under 1998 Guidelines, where on three occasions defendant "participated in a cocaine importation scheme or schemes, spanning at least 13 months . . . [that] amount to a pattern of knowing, planned and deliberate activity that can hardly be described as spontaneous," much less "short-lived").[4]  In the present case, the defendant's criminal conduct stretched from May 1998 (when Andrews agreed to Silvester's proposal to insert him into the Landmark deal), through June 1998 (when Andrews agreed to split half his fee with Stack), through July 1998 (when Silvester invested the $100 million with Landmark), through the 1998 campaign season (during which Andrews received his first fee check from Landmark, and used straw campaign contributors to funnel money into Silvester's campaign), through November 1998 (when, hard on the heels of electoral defeat, Andrews asked Silvester to invest another $50 million with Landmark), through December 1998 (when that deal was consummated), through January and February 1999 (when Andrews deposited another two Landmark checks), through July 1999 (when he lied to federal investigators about whether Silvester was aware of the split with Stack), through April 2000 (when he instructed Jill

---

[4]Indeed, the defendant satisfies only one of the criteria set forth in *Zecevic* and *Martinez,* namely, that he has no prior criminal record.  As for the remaining factors, each militates against a finding of aberrant conduct in the present case: (1) his crime was not a "singular" act; (2) his conduct was not spontaneous but instead required planning; (3) the defendant does not claim to have been under any "extreme pressures" such as "psychological disorders" at the time of the offense, (4) the defendant acted out of pecuniary gain; and (5) the defendant took no steps to mitigate his crime, but instead attempted to cover it up.  *See Martinez*, 207 F.3d at 137 (listing permissible factors).

Chmieleski to lie to federal investigators),[5] and up to October 2003 (when he spent two days giving false testimony before this Court).

Nor was the defendant's misconduct in the present case a marked deviation from his past. As shown during cross-examination, the defendant had previously engaged in a number of dishonest acts: placing false information about his date of birth on his SEC application, a job application, and campaign literature, 10/23/03 Tr. at 30-36; falsely claiming that he had a college degree in his biographical statement, his campaign literature, and his job application, 10/23/03 Tr. at 37-41; making numerous false statements on his bankruptcy petition (for example, falsely claiming that he had no expectations of future income, despite the fact that *one day* after the filing of his bankruptcy petition, the State of Connecticut announced it would invest $150 million with Brown Capital on which he would earn approximately $1.9 million over the following year, 10/23/03 Tr. 13-17); falsely omitting information about his outstanding $577,000 mortgage on a loan application, 10/23/03 Tr. 23-26; and falsely describing the reasons for his bankruptcy on his SEC application, 10/23/03 Tr. 42-56. Indeed, the defendant's pattern of deceit manifested itself during his trial testimony about Brown Capital, in which he falsely claimed credit for having convinced that company to make a presentation to Connecticut, resulting in a $400 million

---

[5] Although Andrews was acquitted on Count 13 (witness tampering), the principal weakness in the Government's case was whether the defendant's intent in instructing Jill Chmieleski (and through her, Robin Condon) to lie to federal investigators was to influence their testimony before a federal grand jury. The Government had argued that because federal investigators had previously interviewed Andrews in 1999, he was likely to have understood that the two women were likely to receive grand jury subpoenas. Although it cannot be determined on what grounds the jury chose to acquit, the Government respectfully submits that the Court may find, by a preponderance of the evidence, that Jill Chmieleski and Robin Condon were credible witnesses; that Andrews did instruct them to lie to federal investigators; and that such conduct, even if it does not constitute "witness tampering" pursuant to 18 U.S.C. § 1512, nevertheless constitutes serious misconduct that undermines any claim of "aberrant conduct."

investment (10/22/03 Tr. at 34-36), whereas in reality (as Eddie Brown testified) Andrews had been inserted at the last minute as a "consultant," even though he had done nothing to land the contract.

### D. The Sentencing Range Suggested by the Sentencing Guidelines Is Reasonable

The Government offers a specific response only to the defendant's primary argument: that for many white-collar criminals such as Andrews, "the prospect of investigation, the financial destruction . . . , and the shame that comes with a conviction are sufficient to achieve the requisite deterrence." Def. Mem. at 14.

For the moment, leave aside the notion that white-collar defendants generally deserve less jail time, presumably because they have farther to fall than less-highly placed criminals. The fact remains that Ben Andrews was a key figure in a sweeping political corruption scandal that has dramatically undercut the faith of Connecticut citizens in their state government. He showed no compunction about joining Paul Silvester's corrupt scheme, even though it was made possible only by the manipulation of pension funds that were being held in trust for thousands of hard-working Connecticut citizens. He showed no compunction about deriving personal profit from such illicit payments *at the same time* that he was placing himself before the voters of this State as a person worthy of their trust as the next Secretary of State. "Shame" is simply no substitute for imprisonment, particularly where the defendant has manifested no contrition.

As set forth in 18 U.S.C. § 3553(a)(2)(A), the sentence in this case must reflect the seriousness of this offense. It should reflect the defendant's full partnership in a corruption scheme that shook the office of the State Treasurer to the core, and that impugned the state's management of billions of dollars set aside to secure the retirement of thousands of state workers.

It should also be a sentence that promotes respect for the law: Connecticut's citizens should know that appropriate punishment awaits those who abuse the public trust for personal profit, and who seek to subvert the criminal justice system by lying to investigators, by urging other witnesses to lie, and by perjuring themselves before a jury.

In short, a just sentence in this case is one which cannot be touted by the defendant – whether to the press, to his friends, or to himself – as a vindication of his claim that what he did was not, after all, really that bad.

### IV. Fine

As explained in the Government's objection letter to the Probation Office on December 2, 2004, the defendant failed to disclose in his original (and unsigned) financial affidavit the fact that he had funneled an enormous amount of assets through his wife's bank account after he was indicted, and that much of these assets were converted into bank checks that were shuffled through numerous other accounts. *See* PSR, Third Addendum, attachment. The defendant recently filed a revised financial affidavit, which he has signed. Nonetheless, in the section entitled "Transfer of Assets" (page 5), he still neglects to mention the more than $880,000 in Brown Capital funds that he placed in his wife's account, a significant portion of which he converted into treasurer's checks in her name. Rather, he simply claims that the only asset that he transferred or sold was a 1997 Chevy Tahoe, worth approximately $9500.

While it remains unclear what happened to all this money, the defendant's failure to address this issue (even after the matter was brought to his attention), combined with the fact that he engaged in these extraordinarily suspicious transactions in the first place, leaves a hole in his financial statement which makes it impossible to determine whether the defendant is unable to

pay the recommended fine. Accordingly, it is the Government's position that the Court should impose a fine within the applicable guidelines range of $10,000 to $500,000.

## V. Conclusion

For all of the above reasons, the Government respectfully requests that the Court adopt the factual findings and guideline calculations of the PSR, deny the defendant's motions for downward departure, and impose a sentence within the Guideline range of 57-71 months.

Respectfully submitted,

JOHN H. DURHAM
ACTING UNITED STATES ATTORNEY

DAVID A. RING
ASSISTANT UNITED STATES ATTORNEY
Fed. Bar No. ct14362

/s/ William J. Nardini

WILLIAM NARDINI
ASSISTANT UNITED STATES ATTORNEY
Fed. Bar No. ct16012
157 Church Street, 23rd Floor
New Haven, CT  06510
Tel.: (203) 821-3748
Fax: (203) 773-5377
william.nardini@usdoj.gov

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing Response was sent by fax this 29th of April, 2005 to:

> Jeremiah Donovan, Esquire
> Law Offices
> 123 Elm Street, Unit 400
> Old Saybrook, Connecticut 06475

>> /s/ William J. Nardini
>> _____
>> WILLIAM J. NARDINI
>> ASSISTANT UNITED STATES ATTORNEY